██████ **REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | | |
|---|---|---|
| HEALTH NET FEDERAL SERVICES, LLC, | ) | |
| | ) | No. _____ |
| Plaintiff, | ) | |
| | ) | Judge _____ |
| v. | ) | |
| | ) | ████████████████████ |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Health Net Federal Services, LLC ("HNFS"), through undersigned counsel, files this Complaint for declaratory and injunctive relief against Defendant, the United States of America. In support of this action, HNFS states and alleges as follows:

### I.       NATURE OF THE ACTION

1.       This is a post-award bid protest challenging the Defense Health Agency's ("DHA") award of the Fifth-Generation TRICARE Managed Care Support Services West Region contract, valued at over sixty-five billion dollars, for providing healthcare services to roughly 9.6 million military members and their families, to TriWest Healthcare Alliance Corp. ("TriWest") under Solicitation No. HT9402-20-R-0005 ("Solicitation" or "RFP").

2.       DHA's award to TriWest was fundamentally flawed for numerous reasons set forth in this Complaint and briefly summarized in the following paragraphs.

3.       As an initial matter, TriWest was not eligible for award. TriWest made multiple material misrepresentations in its Factor 4, Small Business Participation submission and its responsibility communications with DHA regarding TriWest's approach to subcontracting for this procurement as well as prior contracts. These misrepresentations, which implicate ████

████████████████████████████████████████

REDACTED VERSION

of dollars in subcontracting spend—as well as material TriWest misrepresentations dating back as far as 2009—require TriWest's elimination from the procurement, at a minimum.

4.    DHA also unreasonably accepted TriWest's method to develop subcontracting goals for this procurement, which was dependent upon TriWest's admittedly flawed historic methodology that DHA knew was impermissible.  In short, when read in accordance with law and regulation, TriWest's proposal did not meet the Solicitation's threshold goals for small business subcontracting, and, even if not eliminated for its numerous material misrepresentations, TriWest's proposal should have been evaluated as unacceptable.

5.    Based on the limited record production at GAO, TriWest's corrective action revisions to its Factor 4 submission also appear to have created irreconcilable inconsistencies in TriWest's proposal.  Yet, DHA completely ignored this issue in its rush to re-award to TriWest following corrective action in response to HNFS' original GAO protest.

6.    DHA committed further errors in its evaluation of TriWest's Factor 4 proposal. TriWest will be relying on a host of network subcontractors to perform the contract, but these entities are not "concerns" and do not "control" TriWest, meaning that they cannot be considered "affiliates" of TriWest under FAR 2.101.  These entities (along with other impermissible exclusions) must therefore be added back into TriWest's subcontracting calculations, rendering TriWest's proposal unacceptable and unawardable under Factor 4 of the RFP.

7.    Furthermore, it is undisputed that TriWest did not provide a required letter of commitment for its proposed network subcontractor BlueCross BlueShield of Alabama. TriWest's proposal repeatedly referenced BlueCross BlueShield of Alabama and demonstrated TriWest's reliance on that entity and its nationwide network, *and* both TriWest and BCBS of Alabama issued post-award press releases confirming BCBS of Alabama's substantive

involvement in performance of the T-5 contract.  Nevertheless, TriWest failed to submit this letter of commitment in direct contravention of the RFP's mandatory requirement to provide letters of commitment for all parent and leased provider networks.

8.      DHA's proposal evaluations fare no better.  DHA's Technical and Technical Risk evaluations of TriWest's proposal were fundamentally flawed.  DHA overlooked the numerous problems implicated by TriWest's proposed network approach and simply accepted TriWest's statements that it could meet or exceed the RFP's requirements.  As a result, DHA overlooked TriWest's failure to address how it would convince providers to accept T-5's lower reimbursement rates.  And, despite the RFP's explicit requirement to evaluate offerors' "demonstrated experience" with their proposed approaches, DHA failed to evaluate the significant differences between the experience on which TriWest relied and T-5.

9.      DHA's assignment of Weaknesses to HNFS' Technical Proposal was the result of misleading and inadequate discussions and DHA's application of unstated evaluation criteria. During the multiple rounds of discussions in this procurement, DHA misled HNFS into believing that any concerns regarding the Weaknesses were previously resolved and needed not be further addressed in HNFS' proposal.  Moreover, the weaknesses themselves were based on considerations untethered from the RFP's actual technical evaluation criteria, thus rendering DHA's assignment of these weaknesses unreasonable and contrary to the RFP.

10.      DHA's Past Performance evaluations were similarly flawed.  In the critical assessment of each offeror's most significant prior contracts, DHA performed unlawful assessments of both Past Performance relevancy and quality.  In the relevancy assessment of TriWest's critical Patient-Centered Community Care ("PC3") contract, the evaluators repeatedly deviated from the RFP evaluation criteria to award TriWest maximum relevancy credit where

none was warranted.  In evaluating performance quality, DHA overlooked close at hand information about HNFS' incumbent T-2017 West Region contract that would have placed five-year-old, isolated Contractor Performance Assessment Reporting System ("CPARS") commentary in proper context.  This error led DHA to prioritize limited outdated performance concerns over HNFS' numerous years of recent and consecutive exceptional CPARS evaluations under the same contract that are further supported by a highly favorable past performance questionnaire completed during the T-5 procurement by the DHA contracting staff.  Finally, time and again DHA treated HNFS and TriWest unequally, going out of the way to excuse historic TriWest performance challenges yet refusing to do the same for HNFS.  The result of these and additional errors was the illogical conclusion that TriWest—an entity that has not performed a TRICARE MCS contract in nearly a decade and that has no existing TRICARE network—had equally relevant and more favorable Past Performance than the successfully performing West Region incumbent who has received glowing performance assessments for years.

11.     As a result of each and all of the foregoing issues, DHA's best value decision is irrevocably flawed.  Despite HNFS' $465 million evaluated cost/price advantage, DHA selected TriWest's proposal for award because DHA mistakenly believed that TriWest proposed a technically acceptable proposal with a larger, essentially already-built "federal network" that would pose little if any risk of unsuccessful performance.  However, TriWest's proposal was not technically acceptable—due to TriWest's failure to meet RFP requirements and TriWest's affirmative misrepresentations—and even if it were, DHA's evaluation was riddled with unreasonable conclusions and pervasive disparate treatment.  Accordingly, DHA could not reasonably, or lawfully, conclude that TriWest's proposal provided the best value to the Government.

## II.    JURISDICTION

12.    The Court has jurisdiction over this bid protest action pursuant to 28 U.S.C.

§ 1491(b).  This is a post-award bid protest by a party "objecting to . . . the award of a contract

[and] alleged violation of statute or regulation in connection with a procurement."  *See id.*

Additionally, the Court has jurisdiction to consider this action because it is "a claim that the

Government breached an implied-in-fact contract to fairly and honestly consider an offeror's

proposal in the procurement context" under 1491(b)(l).  *See Safeguard Base Operations, LLC v.*

*United States*, 989 F.3d 1326, 1332 (Fed. Cir. 2021); *see also Emery Worldwide Airlines, Inc. v.*

*United States*, 49 Fed. Cl. 211, 220 (2001), *aff'd,* 264 F.3d 1071, 1080 (Fed. Cir. 2001).

## III.    THE PARTIES

13.    Plaintiff HNFS is a company headquartered in Sacramento, California.  HNFS has

administered managed health care programs for the Department of Defense and the Department

of Veterans Affairs for more than three decades and is the incumbent TRICARE West service

provider to over 2.8 million active duty, retired, National Guard and Reserve, and family

member beneficiaries.

14.    Defendant is the United States of America, acting through the Department of

Defense, Defense Health Agency.

## IV.    FACTUAL BACKGROUND

### *The Procurement and Evaluation Criteria*

15.    This protest involves a contract to provide Managed Care Support ("MCS") to the

Department of Defense ("DoD") TRICARE program.  *See* Ex. 1, Conformed RFP, at C1 (GAO

AR Tab 87).[1]  This latest iteration of the long-standing MCS program is called T-5 and

---

[1]    Due to the voluminous record in this procurement, as well as the fact that HNFS
understands the Government will produce the full Administrative Record to the Court, HNFS is

contemplates award of two MCS contracts: one for the East Region, and one for the West

Region.  In comparison to the prior iteration of TRICARE ("T-2017"), T-5 involves a shift of six

states from the East Region to the West Region, affecting approximately 1.5 million

beneficiaries.  The states moving from the East Region to the West Region are Arkansas, Illinois,

Louisiana, Oklahoma, Texas, and Wisconsin.

16.     Under the contract, the MCS contractor assists the Military Health System

("MHS") in operating an integrated healthcare delivery system, combining resources of the

military's direct medical care system and the contractor's private sector managed care support to

provide health, medical, and administrative support services to TRICARE-eligible beneficiaries.

*Id.* at C1.

17.     The objectives of the contract are as follows: (1) Readiness – support the MHS

readiness mission by partnering with the Military Medical Treatment Facilities ("MTFs") to

optimize the delivery of health care services to enhance the clinical expertise of providers in the

direct care system for all TRICARE-eligible beneficiaries; (2) Experience of Care – provide a

care experience that is patient and family centered, compassionate, convenient, equitable, safe,

and always of the highest quality; (3) Manage Per Capita Cost – create value by focusing on

quality, eliminating waste, and reducing unwarranted variation; considering the total cost of care

over time, not just the cost of an individual health care activity; and (4) Population Health –

within the constraints, boundaries, and benefits of the current program, encourage beneficiaries

and providers to seek ways to improve health.  *Id.*

---

attaching to this Complaint a copy of the Conformed Solicitation and the GAO Protected
Decision.  For clarity, HNFS is including citations in this Complaint to the GAO Agency Record
("GAO AR"), as well as to submissions made before GAO (*e.g.*, the Agency Reports,
Contracting Officer Statements, and Exhibits to the parties' GAO submissions), all of which
HNFS expects the Government to include in the Administrative Record.

**REDACTED VERSION**

18.     The MCS contractor is responsible for establishing and maintaining networks of individual and institutional providers for TRICARE beneficiaries.  *Id.* at C2.  In doing so, the successful MCS contractor is required to ensure that all of its network providers are eligible to participate in the TRICARE program and that the providers in its network are sufficient in number, mix, and geographic distribution to provide the full scope of benefits for which all TRICARE enrollees are eligible.  *Id.*

### *Evaluation Criteria*

19.     The Solicitation provided that DHA would evaluate proposals on the basis of four evaluation criteria:  Factor 1, Technical/Risk; Factor 2, Past Performance; Factor 3, Price/Cost; and Factor 4, Small Business Participation.  *Id.* at M2.  Under the Technical Factor, the RFP further provided six subfactors:  Subfactor 1, Network Management; Subfactor 2, Clinical Management; Subfactor 3, Administration and Customer Service; Subfactor 4, Claims and Systems; Subfactor 5, Transition Management; and Subfactor 6, Future Potential Demonstrations/Product Improvements.  *Id.*

20.     The RFP provided that Factor 4, Small Business Participation served as a gatekeeper and "will not be included in the integrated assessment or trade-off process; however, award will not be made to an Offeror with an unacceptable rating under any factor or subfactor." *Id.*  The RFP explained that the Technical/Risk and Past Performance factors were listed in descending order of importance and that the two non-price factors combined were significantly more important than Factor 3, Price/Cost.  *Id.*  Within the Technical/Risk Factor, Subfactors 1 through 5 were considered of equal importance and, individually, more important than Subfactor 6.  *Id.*



### *Gatekeeper Factor 4, Small Business Participation*

21.     Under Factor 4, Small Business Participation, offerors' proposed subcontracting plans and small business utilization were to be assessed on an acceptable/unacceptable basis as follows:

    a.  <u>Acceptable</u>:  Proposal clearly meets the minimum requirements of the solicitation.

    b.  <u>Unacceptable</u>:  Proposal does not clearly meet the minimum requirements of the solicitation.

*Id.* at M23.

### *Factor 1, Technical Risk*

22.     As part of the evaluation of each offeror's technical proposal, DHA would assess "technical" and "technical risk" ratings for each Technical/Risk subfactor.  *Id.* at M3 to M4.  The technical and the technical risk ratings for each subfactor would "not be rolled up" into one overall Technical/Risk Factor rating.  *Id.*

23.     For the technical assessment, DHA used the following adjectival ratings:

    a.  <u>Outstanding</u> (Blue):  Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths.

    b.  <u>Good</u> (Purple):  Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength.

    c.  <u>Acceptable</u> (Green):  Proposal indicates an adequate approach and understanding of the requirements.

    d.  <u>Marginal</u> (Yellow):  Proposal has not demonstrated an adequate approach and understanding of the requirements.

    e.  <u>Unacceptable</u> (Red):  Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable.

*Id.* at M3.

24.     The technical risk assessment would include an evaluation of the offeror's
proposed approach, method, or process for completing tasks and the offeror's demonstrated
experience in performing tasks (including experience in performing a proposed approach,
method, or process).  *Id.* at M4.  DHA used the following adjectival technical risk ratings:

    a.  <u>Low</u>:  Proposal may contain weakness(es) which have little potential to cause
disruption of schedule, increased cost or degradation of performance.  Normal
contractor effort and normal Government monitoring will likely be able to
overcome any difficulties.

    b.  <u>Moderate</u>:  Proposal contains a significant weakness or combination of
weaknesses which may potentially cause disruption of schedule, increased
cost or degradation of performance.  Special contractor emphasis and close
Government monitoring will likely be able to overcome difficulties.

    c.  <u>High</u>:  Proposal contains a significant weakness or combination of weaknesses
which is likely to cause significant disruption of schedule, increased cost or
degradation of performance.  Is unlikely to overcome any difficulties even
with special contractor emphasis and close Government monitoring.

    d.  <u>Unacceptable</u>:  Proposal contains a material failure or a combination of
significant weaknesses that increases the risk of unsuccessful performance to
an unacceptable level.

*Id.*

25.     Under Subfactor 1, Network Management, the Solicitation listed seven separate
components (each with further subcomponents and sub-criteria) that DHA would assess in each
offeror's proposal.  *Id.* at M5 to M7.  Under Subfactor 2, Clinical Management, the Solicitation
listed eight separate components (each with further subcomponents and sub-criteria) that DHA
would assess in each offeror's proposal.  *Id.* at M7 to M10.  Under Subfactor 3, Administration
and Customer Service, the Solicitation listed eight separate components (many with further
subcomponents and sub-criteria) that DHA would assess in each offeror's proposal.  *Id.* at M10
to M12.  Under Subfactor 5, Transition Management, DHA was to evaluate "the effectiveness of
the Offeror's proposed Integrated Master Schedule (beginning at contract award for 12

continuous months) and Integrated Master Plan (IMP/IMS) and its compliance with stated

contract transition-in requirements . . . ." *Id.* at M14.  Under Subfactor 6, Future Potential

Demonstrations/Product Improvements, DHA was to evaluate offerors' proposals related to a

series of specified "Future Potential Demonstrations/Product Improvements" that may or may

not be implemented during T-5 performance, as well as offerors' proposed approaches to

implementing increasing amounts of Alternative Payment Models throughout performance.  *See*

*id.* at M14 to M19.

### *Factor 2, Past Performance*

26.      For Factor 2, Past Performance, offerors were to identify ten recent and relevant

contracts for the offeror or first-tier subcontractors, or both.  *Id.* at L30.  The RFP defined "first-

tier subcontractors" for the Past Performance factor alone as "a subcontractor that will have a

subcontract directly with the prime contractor valued in excess of $100 Million (inclusive of all

contract options)" but that "[i]nstitutional, professional, and other health care providers as

defined in 32 CFR 199.6 are not considered subcontractors."  *Id.*  Offerors were also permitted to

submit relevant past performance references for a parent or affiliated company provided that the

offeror explained "the scope and extent to which the entity will be involved, or its resources

utilized, in the daily operations of the Offeror in its performance of the requirements described in

the solicitation."  *Id.* at L31.  Past performance references had to be recent, meaning ongoing or

completed within the last three years.  *Id.* at M19.  Where an offeror's past performance

references met the minimum recency criterion, the Solicitation instructed that DHA would then

assess each individual reference for:  (1) degree of relevancy and (2) quality of performance.  *Id.*

at M19 to M24.

*Factor 3, Price/Cost*

27.     For the Price/Cost Factor, the offeror's total evaluated price ("TEP") for the base
and all option years would be assessed to determine reasonableness and individual contract line
items ("CLINs") would be reviewed to ensure balanced pricing.  *Id.* at M22 to M23.  The CLINs
included cost-reimbursable and fixed-price items.  *Id.* at 213.  The RFP provided "plug-in" prices
for the cost-reimbursable Underwritten Healthcare Costs, which DHA already assessed for
realism.  *Id.* at M22; *see also id.* at L32 to L35.  Offerors were permitted to propose guaranteed
network-provider discounts to DHA's plug-in pricing, which DHA would only assess to
determine the validity of the discount percentages but would not conduct any further realism
analysis.  *Id.* at M22.

28.     Subcontracting plans would be evaluated for compliance with the "13 elements of
FAR 19.704," which included, among other things, meeting the RFP's percentage goals for using
small businesses, a statement of the total dollars planned to be subcontracted, and a statement of
the total dollars planned to be subcontracted to small business.  *See id.* at L11 to L14.  DHA
would also assess "the extent the Offeror identifies businesses in the Plan and demonstrated good
faith efforts or plans to meet the below goals using small business, veteran-owned small
business, service-disabled veteran-owned small business, [Historically Underutilized Business
Zone  ("HUBZone")] small business, small disadvantaged business (which includes historically
black colleges, Alaska Native Corporations (ANCs), Indian Tribes and minority institutions in its
goal), and women-owned small business subcontractors to the maximum practicable."  *Id.* at
M23.

*Proposal Submission, Discussions, and Initial Award*

29.     Offerors submitted initial proposals in August 2021.

30.     In February 2022, DHA established a competitive range, including HNFS and TriWest, and opened discussions with both offerors.  Over the next six months, DHA conducted 10 rounds of written discussions, as well as two rounds of oral discussions.

31.     On July 18, 2022, DHA issued Amendment 0012, requesting final proposal revisions ("FPRs") and informing offerors that discussions were closed.  HNFS timely submitted its final revised T-5 West Region proposal on July 20, 2022.

32.     On December 22, 2022, DHA notified HNFS that TriWest had been selected for award.  The heavily redacted SSDD that DHA later produced before the GAO showed that DHA evaluated HNFS and TriWest as discussed in the following paragraphs.

33.     For Factor 1, Technical and Technical Risk, DHA assigned the following adjectival ratings to HNFS and TriWest under the six technical subfactors:

| | HNFS | TW |
|---|---|---|
| Subfactor 1 Network Management | Acceptable | Outstanding |
| Subfactor 2 Clinical Management | Good | Good |
| Subfactor 3 Administration and Customer Service | Acceptable | Acceptable |
| Subfactor 4 Claims and Systems | Good | Good |
| Subfactor 5 Transition Management | Acceptable | Acceptable |
| Subfactor 6 Future Potential Demonstrations/Product Improvements | Good | Good |

SSDD (GAO AR Tab 141) at 43.

34.     As relevant here, DHA identified numerous strengths in HNFS' proposal and assigned a "Low" technical risk rating but downgraded HNFS' proposal because of two alleged weaknesses.  *Id.*

35.     Under Past Performance, both offerors received a "Satisfactory Confidence" rating.  *Id.* at 55.  For the ███ past-performance references that HNFS submitted, DHA found ██ references "Very Relevant" and rated the quality of multiple references as "Exceptional" or "Very Good."  *Id.*

36.     DHA also found that TriWest "did not meet individual category goals" for Small Business Compliance for any of its three past-performance references that included small-business requirements.  *See id.* at 52.

37.     While DHA rated both offerors equally and concluded that "[b]oth offerors experienced performance issues as evidenced by the evaluation of the submitted contract[,]" DHA asserted that TriWest possessed a superior past-performance record because of "██

██████████████████████████████████████████████████████████████

██████████████████████████████████"  *Id.* at 55-56.

38.     For Factor 3, Price, the SSDD showed that HNFS was the lower-priced offeror:

| Offeror | Total Evaluated Price (TEP) | Amount Difference | Percent Difference |
|---------|------------------------------|-------------------|--------------------|
| HNFS    | $64,597,090,402              |                   |                    |
| TW      | $65,062,399,682              | $465,309,280      | 0.7%               |

*Id.* at 56.

39.     Finally, under Factor 4, Small Business Subcontracting, both offerors received an "Acceptable" rating based on DHA's review of the offerors' subcontracting plans and small-business participation plans.  *Id.*

40.     In conducting the best value tradeoff, DHA focused its best value decision on

Technical Subfactors 1 and 2, areas where TriWest purportedly possessed a slight technical

advantage, but ignored the equally important Technical Subfactors 3 and 5 where HNFS was the

superior offeror.  *Id.* at 60-70.  DHA also indicated that although HNFS and TriWest both

received identical adjectival ratings under Past Performance, TriWest possessed a slight

advantage.  *Id.* at 70.  As a result, despite HNFS offering the lower-priced proposal, DHA

determined that TriWest's purported technical edge was not offset by HNFS' $465,309,280

lower price:

> Regarding Factor 3 Price, I note that the non-price Factors (Factor
> 1 and 2) when combined are significantly more important than
> Factor 3 Price.  **The TEP of both Offeror's** are determined to be
> reasonable and **are only 0.7% apart**.  **This is remarkable for a
> contract of this magnitude in both time and dollar value
> (expected period of performance of 9 years and total value in
> excess of $60B)**.

*Id.* at 70 (emphasis added).

41.     In reaching this result, DHA completely ignored the fact that this total contract

value is greatly inflated by the large amount of "plug-in" health care costs numbers set by DHA

in the RFP.  *See* Ex. 1, Conformed RFP, at 184-85 (GAO AR Tab 87).  Indeed, the RFP provided

"plug-in figures" for eight Underwritten Healthcare Costs **totaling $57,607,968,434**.  *Id.* at 185.

The RFP further provided additional plug-in numbers for Future Potential Demonstration,

Service Assist Teams, and MTF/Guard/Reserve/MSO/VSO Briefing CLINs raising the total

fixed figures to **$57,657,568,434**.  *Id.*  Once these plug-in numbers are removed, the actual

pricing controlled by offerors – the PMPM, underwriting fee, network discount, and transition

costs – is significantly reduced to approximately $10,000,000,000.  Under this analysis, HNFS'

REDACTED VERSION

$500,000,000 price discount is significantly more important as it represents a remarkably lower price proposal of the controllable pricing.

### *HNFS' Initial Protest at GAO, Corrective Action, and Re-Award to TriWest*

42.     On January 17, 2023, HNFS filed its protest with GAO, challenging DHA's award to TriWest.  *See generally* HNFS January 17, 2023 GAO Protest.

43.     HNFS' lead protest argument was that DHA failed to reasonably evaluate TriWest's proposal and small business participation and subcontracting capabilities under Factor 4, Small Business Participation, and that had DHA done so, it would have found TriWest ineligible for award. For example, HNFS explained that TriWest failed to submit an acceptable Small Business Subcontracting Plan or to demonstrate small business participation to the maximum extent practicable consistent with the RFP's Factor 4 requirements because (1) the numerous Blue Cross Blue Shield ("BCBS") entity part-owners of TriWest are not "affiliates" eligible for exclusion from the calculations for small business participation; (2) TriWest proposed to rely almost exclusively on non-affiliate, other-than-small businesses as first-tier subcontractors; and (3) as a result of its almost exclusive reliance on other-than-small businesses, TriWest cannot meet the RFP's Factor 4 requirements. HNFS further demonstrated TriWest's inability to meet the required small business subcontracting goals through the fact that TriWest failed to meet small business goals for any of TriWest's three past performance references, a fact that DHA documented but ignored in its evaluation.

44.     On February 6, 2023, DHA filed a Notice of Corrective Action, recognizing the need for DHA to address the issues surrounding TriWest's Factor 4 proposal and eligibility for award.

45.     Specifically, DHA pledged to:

> [R]eopen discussions with TriWest to discuss potential flaws in its
> Factor 4 proposal, accept revisions to its Factor 4 proposal and
> other proposal volumes if substantiated as related to changes to its
> small business subcontracting plan, reevaluate TriWest's proposal
> based on any revisions, and make a new best value decision. In
> addition, the DHA may take any additional corrective action it
> deems appropriate.

46.     In light of DHA's Notice of Corrective Action, on February 9, 2023, GAO

dismissed HNFS' original protest as academic.

47.     On February 15, 2023, DHA sent offerors a letter stating that DHA was reopening

discussions "with all offerors under Factor 4- Small Business Participation."  Attached to the

Reopening Discussions Letter, each offeror received an EN, requesting that it confirm or explain

various calculations represented in its Factor 4 proposal.

48.     On February 24, 2023, offerors received a second EN, in which DHA notified

offerors that "[t]he Government is providing clarification that it uses the definition of 'Affiliate'

found at FAR 2.101 for the purpose of determining whether an offeror's associated entities are

subject to inclusion as subcontractors in the offeror's Small Business Subcontracting Plan."

DHA further requested that offerors update their Factor 4 proposal, if necessary, utilizing the

FAR 2.101 definition.

49.     On March 14, 2023, DHA notified offerors that discussions were closed and that

each offeror had until March 20, 2023, to either submit a revised Factor 4 proposal or confirm

that it had no changes to its prior proposal.

50.     On March 22, 2023—a mere two days after revised Factor 4 submissions were

received—DHA's Source Selection Authority signed an Addendum to the SSDD reaffirming the

award to TriWest.  That SSDD Report Addendum, in its entirety, stated as follows:

Factor 4: Small Business

As SSA, I have reviewed the Contracting Officer's evaluation of TriWest's revised proposed Small Business Subcontracting Plan. I concur with the Contracting Officer's determination that TriWest proposed a good faith effort to meet the Solicitation's small business subcontracting goals and that their revised proposal is Acceptable. The Contracting Officer previously evaluated HNFS as Acceptable, to which I concurred.

I also concur with the SSAC's Summary of Comparative Analysis for Factor 4, which states that "Both HNFS and TriWest's proposals are Acceptable. Therefore, both offerors are eligible for award."

Finally, I considered SSAC's award recommendation that, "With no other changes to the evaluation and in accordance with M.2., Basis of Evaluation, we recommend award to TriWest in the West Region as the best value offer." I concur with the SSAC's award recommendation that TriWest is the best value offer in the West Region.

SSDD Report Addendum (GAO AR Tab 158) at 2.

51.     On April 20, 2023, DHA notified HNFS via letter that DHA had, once again, selected TriWest for award.  With that letter, DHA provided HNFS a copy of the SSDD Report Addendum executed a month earlier.

52.     On May 1, 2023, HNFS filed its second protest with GAO, challenging, once again, DHA's award to TriWest.  In that protest, and in supplemental GAO protests HNFS filed based on DHA's selective production of a heavily redacted Agency Report, HNFS' lead arguments once again centered on DHA's threshold evaluation of TriWest's Factor 4 proposal. For example, HNFS again challenged the reasonableness of DHA's evaluation, and HNFS identified numerous misrepresentations in TriWest's submissions to DHA that required its elimination from the competition.  Relevant here, HNFS also identified and challenged numerous prejudicial errors in DHA's Technical and Past Performance evaluations for both offerors.

53.     Throughout HNFS' GAO protest, HNFS repeatedly requested that GAO direct DHA and TriWest to produce relevant additional documents—including, *e.g.*, portions of the TriWest proposal in this procurement that DHA had redacted or withheld, as well as TriWest corporate documents expressly referenced in TriWest's proposal and/or TriWest's and DHA's arguments before GAO.  Certain requested documents were of particular relevance considering HNFS' allegations of multiple TriWest material misrepresentations.  However, GAO repeatedly refused to order such productions, resulting in an incomplete record—even as to key issues in this procurement.

54.     On August 4, 2023, GAO, relying on the limited record before it, denied HNFS' protest in its entirety.  Ex. 2, GAO August 4, 2023 Protected Decision.

55.     This protest follows.

56.     The following sections provide further factual background issues relevant to this protest.

### *TriWest's Factor 4 Misrepresentations and DHA's Flawed Evaluation*

57.     Factor 4, Small Business Participation, required offerors to submit, and DHA to evaluate, five separate components: (1) a small-business subcontracting plan; (2) participation of small businesses; (3) subcontracting goals; (4) identification of businesses; and (5) demonstrated good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable.  Ex. 1, Conformed RFP, at M23 (GAO AR Tab 87).  In full, the Solicitation's evaluation requirements for Factor 4, Small Business Participation are as follows:

> M.10.1. The Government will evaluate the **subcontracting plan and participation of small businesses** on an acceptable/non-acceptable basis.  **Acceptable – Proposal clearly meets the minimum requirements of the solicitation** (Strengths are not assessed for this evaluation).  **Unacceptable – Proposal does not clearly meet the minimum requirements of the solicitation**.

The Contracting Officer (CO) will evaluate the subcontracting plan submitted under Volume I for compliance with Section L.5.2.

M.10.2. **The Government will assess how the Offeror's proposed subcontracting goals compare with the following subcontracting goals**.  The Government **will assess the extent the Offeror identifies businesses in the Plan and demonstrated good faith efforts or plans to meet the below goals** using small business, veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business (which includes historically black colleges, Alaska Native Corporations (ANCs), Indian Tribes and minority institutions in its goal), and women-owned small business subcontractors to the maximum practicable.

*Id.* (emphases added).

58.      As part of these Factor 4 requirements, the Solicitation also mandated that offerors provide (and DHA evaluate) a subcontracting plan "as required by FAR 19.702, FAR 19.704, FAR 52.219-8 Utilization of Small Business Concerns, FAR 52.219-9 Small Business Subcontracting Plan (SBSP), and DFARS 252.219-7003, Small Business Subcontracting Plan (DoD Contracts), Alt I."  *Id.* at L12.

59.      The Solicitation explained that the "13 elements of FAR 19.704 [we]re required to be included in Offeror's subcontracting plan."  *Id.*  These elements included, among other things, meeting the Solicitation's percentage goals for using small businesses, a statement of the total dollars planned to be subcontracted, and a statement of the total dollars planned to be subcontracted to small business.  *See id.*

60.      Offerors were also required to "submit a record of . . . compliance with FAR 52.219-8 Utilization of Small Business Concerns and 52.219-9, Small Business Subcontracting Plan including past eSRS, if applicable, and all correspondence with the cognizant CO or Small Business Specialist regarding its compliance for the past three (3) years on current or past Government contracts."  *Id.*

61.     In reviewing offerors' Factor 4 proposals, DHA was required to "assess how the Offeror's proposed subcontracting goals compare with the following subcontracting goals":

> Small Business Subcontracting: 25%
> Women-Owned Small Businesses ("WOSB"): 5%
> Small Disadvantaged Businesses ("SDB"): 5%
> Veteran-Owned Small Business ("VOSB"): 3%
> Service-Disabled Veteran-Owned Small Businesses ("SDVOSB"): 3%
> Historically Underutilized Business Zone ("HUBZone") Small Businesses: 3%
> The AbilityOne Program (National Industry for the Blind/SourceAmerica): 1%

*Id.* at M23 to M24.

62.     DHA was to perform its evaluation of offerors' Factor 4 proposals on an "Acceptable/Unacceptable" basis, only assigning an "Acceptable" rating in instances where a proposal "clearly meets" the Solicitation's requirements.  *See id.* at M23.

63.     Offerors that did not clearly meet the Solicitation's Factor 4 requirements at the time of proposal submission were ineligible for award—"an Offeror must receive an Acceptable rating for this Factor in order to be eligible to receive an award."  *See id.* at M2.

### *TriWest's Organizational Structure and Initial Subcontracting Approach*

64.     TriWest's organizational structure is unique in comparison to the other T-5 offerors.  As TriWest's CEO, Mr. David J. McIntyre, explained to the Senate Veterans' Affairs Committee in October 2022, the sole purpose of the TriWest organization is to leverage the existing resources of non-profit Blue Cross Blue Shield ("BCBS") entities:

> Established more than 25 years ago by a group of non-profit Blue Cross Blue Shield plans and two university hospital systems, TriWest Healthcare Alliance's **sole purpose for existence is to leverage their substantial and mature provider networks** to support VA and the [DoD] in meeting the health care needs of our nation's heroes… members of the military and Veteran communities.

HNFS GAO Protest Ex. 9, Oct. 2022 McIntyre Statement to Senate at 1-2 (emphasis added).[2]

65.    This organizational structure and performance approach is borne out by TriWest's proposal.

66.    The offeror and awardee is TriWest Healthcare Alliance Corp., which is an Arizona Corporation that is wholly owned by TriWest Alliance, Inc., a Delaware Close Corporation.[3] *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 7.

67.    TriWest's proposal explains that TriWest's parent company, TriWest Alliance, Inc., is owned by at least ███ different entities, of which at least ███ are "independent and locally operated" BCBS companies, which are non-profit companies with limited ownership of TriWest. *See id.* at 8 (demonstrating that ████, the largest TriWest shareholder, owns only ████ of TriWest); *see also* HNFS GAO Protest Ex. 12, BCBS Companies and Licensee Information at 1; HNFS GAO Protest Ex. 13, TriWest gains Blue Cross Blue Shield Stakeholders at 1-2.

68.    TriWest has contractual relationships with these entities (referred to as shareholder network subcontractors), as well as with its non-shareholder network subcontractors, which are also "largely independent licensees of the Blue Cross and Blue Shield (BCBS) Association." *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 8.

69.    Indeed, TriWest's proposal states that "TriWest intends to subcontract with independent BCBS entities to execute T-5 contract obligations." *Id.* at 9.

---

[2] *Available at* https://www.veterans.senate.gov/services/files/70B4E9B2-F0F2-425B-B550-853547ED00B6.

[3]    A Close (or Closed) Corporation exists under Title 8, Section 342 of the Delaware Code and is a type of corporation where the shareholders, directors, and officers are typically the same people, and where "[a]ll of the corporation's issued stock of all classes, exclusive of treasury shares, shall be represented by certificates and shall be held of record by not more than a specified number of persons, not exceeding 30." 8 Del. C. 1953 § 342(a).

70.     Regardless of their shareholder status, the entities are not "Affiliates" of TriWest as that term is defined under FAR 2.101.  To be an "Affiliate" as defined under FAR 2.101, the network subcontractor entities must be both a "concern" and "control" TriWest.  *See* FAR 2.101 ("Affiliates means associated business **concerns** or individuals **if**, directly or indirectly either one **controls or can control** the other; or third party controls or can control both[.]") (emphasis added).

71.     According to TriWest, none of the shareholder network subcontractors are organized for profit.  *See* TriWest – FPR – Volume II (GAO AR Tab 103) at 5; TriWest – FPR – Volume III (GAO AR Tab 104) at 3.  And, in order to be a "concern," an entity must be organized for profit.  *See* FAR 19.001 (defining a "concern" as expressly conditioned on a business being "organized for profit").

72.     The shareholder network subcontractors also do not "control" TriWest, another essential element necessary to establish "Affiliate" status under FAR 2.101.

73.     TriWest represented that a "Strategic Alliance Agreement . . . serves as the corporate bylaws for [the TriWest Healthcare] Alliance."  *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 9.  But TriWest has not produced this documentation.  Similarly, TriWest states that the Healthcare Network Agreements ("HNAs") "describe the work [the network subcontractors] will be performing, the TRICARE policies and standards, and how TriWest will manage and oversee their TRICARE network build and maintenance."  *Id.*  TriWest has also not produced this documentation.

74.     TriWest provided letters of commitment for ▮ of the ▮ TriWest shareholder network subcontractors (referred to as "NetSub" in each of the letters of commitment),[4] which purport to "describe[] the relationship of the Parties and NetSub's Commitment to provide the Network."  *See* TriWest – FPR – Volume II (GAO AR Tab 103) at 262-315.  These letters explain that "TriWest and NetSub are acting as **independent contractors** and neither Party shall act as agent or partner of the other Party without the prior written consent of the other Party."  *Id.* at 263 (emphasis added).

75.      Far from demonstrating control, the letters of commitment also state that "**Neither Party shall have authority to bind the other** except to the extent authorized herein." *Id.* (emphasis added).   These letters of commitment refute or contradict any assertions that all or any of the shareholder network subcontractors control TriWest.

76.     Additionally, at least one current TriWest Alliance, Inc. network shareholder has affirmatively stated in a state filing that it "does not control" TriWest:

> Blue Cross and Blue Shield of Arizona, Inc., is the largest shareholder of TriWest Alliance, Inc. (23.17%) **but does not control TriWest Alliance Inc.**

HNFS GAO Protest Ex. 10, Post-Close Org. Chart (emphasis added).

### *TriWest's Misrepresentations and Revised Factor 4 Submission*

77.     In its initial small business subcontracting plan for this $65 billion procurement, TriWest represented that only a mere ▮▮▮▮▮ (or ▮▮ % of the total contract value) was available and planned for subcontracting.  TriWest – FPR – Volume I (GAO AR Tab 102) at 46.

---

[4]      TriWest did not provide a required letter of commitment for BCBS of Alabama with its proposal.

78.     To achieve this figure, which represented TriWest's subcontracting denominator,

TriWest impermissibly reduced the subcontracting opportunities and associated spending in its

Factor 4 submission by several orders of magnitude.

79.     Only in response to ENs during corrective action following HNFS' first bid

protest at GAO did TriWest admit that it had improperly excluded the following categories of

dollars from its subcontracting plan denominator:

> An estimate of the value of contract work excluded under each of the
> exclusions listed in our plan is provided below:
>
> - Supplies and services provided by employees - ███
> - Governmental units and government-endorsed monopolies -
>   ███
> - Non-biddable costs - ███
> - Health care agreements with providers (IAW L.5.2 Network
>   Providers)
>     - These costs were not considered as part of the small
>       business plan development as the RFP required us to
>       exclude them; L.8.17 provides the Government's
>       estimate for this category.
>     - Network arrangements (both Affiliated and non-
>       affiliated Network Subcontractors) - ███
>       breakdown:
>     - Affiliated Network Subcontractors - ███
>     - Non-Affiliated Network Subcontractors - ███

TriWest – Response to EN 01 (GAO AR Tab 146) at 7.

80.     These exclusions account for an astonishing omission of ███ **in**

**subcontracting spending**.

81.     Despite this, aside from the exclusion for "network providers" (for which TriWest

attributed no dollar amount), not a single one of the other categories of exclusions aligns with a

FAR-permitted exception.[5]

---

[5]     FAR 52.219-9(d)(2)(i) provides for the following exclusions from the subcontracting
denominator: "Employee salaries and benefits; payments for petty cash; depreciation; interest;

**REDACTED VERSION**

82.     Failing to consider these exclusions in the initial evaluation, DHA awarded the contract to TriWest, because TriWest's proposed small business subcontracting goals matched (or exceeded) the RFP percentage goals for each category.  TriWest Small Business Evaluation with Attachment (GAO AR Tab 118) at 2.

83.     In response to the first round of corrective action ENs, TriWest conceded that its original small business subcontracting plan improperly excluded a litany of significant other-than-small business subcontractors from the denominator of TriWest's small business subcontracting plan.

84.     First, TriWest admitted that it improperly excluded other-than-small business entities such as ███ , ██████ , and █████ from the denominator of its subcontracting calculation as "non-biddable costs."  TriWest – Response to EN 01 (GAO AR Tab 146) at 7. TriWest explained that its significant ████████ subcontracting exclusions for "Non-biddable costs" "refers to ████████████████

85.     In other words, TriWest excluded significant subcontracting costs from consideration for small businesses because ██████████████

---

income taxes; property taxes; lease payments; bank fees; fines, claims, and dues; original equipment manufacturer relationships during warranty periods (negotiated up front with the product); utilities and other services purchased from a municipality or an entity solely authorized by the municipality to provide those services in a particular geographical region; and philanthropic contributions."

86.     Second, in response to a subsequent and more targeted EN where DHA asked TriWest to explain how it thought such exclusions were permitted, TriWest responded:

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████     TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 10.

87.     Third, with regard to the exclusion of all ██ of TriWest's proposed "network subcontractors," TriWest admitted that its initial small business subcontracting plan also inaccurately represented the scope of its subcontracting denominator by excluding "non-affiliated network subcontractors."  *Id.* at 12.  This too was no small exclusion.  It accounted for ████████ dollars in potential small business opportunities that TriWest otherwise improperly excluded from its subcontracting denominator.  TriWest – Response to EN 01 (GAO AR Tab 146) at 7.

88.     After a request from DHA in a second round of corrective action ENs to identify a valid basis for excluding these significant subcontracting opportunities, TriWest ████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab

150) at 12 (emphasis added).

89. TriWest informed DHA that

*See id*; *see also* TriWest – Response to Contractor Responsibility Determination Questions

(GAO AR Tab 162) at 3. TriWest further confirmed that

*Id.*

90. TriWest also conceded that it has been excluding all of its network subcontractors

from its subcontracting denominator since                          TriWest – Response to EN

02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 12. TriWest confirmed

this historical improper reliance again in responsibility communications. TriWest – Response to

Contractor Responsibility Determination Questions (GAO AR Tab 162) at 3.

91. TriWest has not produced this "guidance" or explained the scope of TriWest's

reliance upon the contracting officer's statements, despite the fact that TriWest's reliance

directly implicates its past performance references for this contract as explained below.

92. Fourth, TriWest also inaccurately represented the other-than-small businesses that

it intends to rely on as subcontractors in T-5 performance. DHA asked TriWest to "provide a list

of all anticipated subcontractors (both small and other than small businesses) as well as what

function they will perform (which supplies provided, services rendered, etc.) and whether these

were excluded from the Small Business subcontracting goals plan under the listed exclusion."
TriWest – Response to EN 01 (GAO AR Tab 146) at 11.

93.     TriWest provided DHA with a table purportedly listing all of the other-than-small businesses that it plans to use in performance of the T-5 contract.  *Id.* at 11-12.  However, the list



94.     For example, TriWest identified the following other-than-small businesses in other portions of its proposal but excluded them from Factor 4 consideration:  ███████

████████████████████████████████████████████████████████████

███████████████████████████████████.  TriWest – FPR – Volume II (GAO AR Tab 103) at 16, 26, 52; TriWest – Subfactor 4 – Final Technical Evaluation_M.7.2.4 (GAO AR Tab 129) at 23.  These subcontractors are not just names referenced in passing. TriWest relies upon them to provide the full suite of support and services identified in its proposal.  *See* TriWest – FPR – Volume II (GAO AR Tab 103).

95.     When TriWest apparently recognized during corrective action that its subcontracting exclusions were improper, it submitted a revised small business subcontracting plan that increased the amounts available for subcontracting with the addition of ███████ in other-than-small business spending.  *See* TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150).

96.     In the revised plan, TriWest's subcontracting denominator increased by approximately ███████ from ███████ to ███████ based on the addition of required other-than-small business subcontracting dollars.  *Compare* TriWest – FPR – Volume I

(GAO AR Tab 102) at 46, *with* TriWest – Response to EN 02 & Submission of Revised Small

Business Plan (GAO AR Tab 150) at 14.

97.     With these additions, TriWest's other-than-small business planned subcontracting

spending is ███████████████████████████████. This

represents ████ of TriWest's revised small business denominator of ████████, leaving

only ████ **of TriWest's entire subcontracting spending for small businesses**.  TriWest –

Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 14.

98.     The revised plan contains additional misrepresentations beyond those present in

TriWest's initial Factor 4 submission.

99.     TriWest's revised Factor 4 submission did not specify the dollar amounts

attributed to the identified categories of remaining exclusions, removed TriWest's largest

(████) original exclusion for "supplies and services provided by employees," and added a new,

albeit unquantified exclusion for "employee costs."  TriWest – FPR – Volume I (GAO AR Tab

102) at 46; TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO

AR Tab 150) at 14.  DHA never asked for additional clarification of "employee costs" as a

categorical exclusion—and TriWest offered no corresponding dollar value or further description

of this exclusion.

100.     Additionally, following TriWest's submission of its revised Factor 4 proposal

during responsibility communications, DHA asked TriWest to provide information in response to

a very simple question:  "Please submit a list of all first-tier subcontracts with a total contract

value of $10 million or more."  TriWest – Response to Contractor Responsibility Determination

Questions (GAO AR Tab 162) at 2.  The list TriWest provided in response did not include a

███████████████████████████████—entities TriWest itself identified as

subcontractors. *Id.* at 2-3. In fact, only ██ of TriWest's proposed large business subcontractors were identified. *Compare* TriWest – Response to EN 01 (GAO AR Tab 146) at 11-12, *with* TriWest – Response to Contractor Responsibility Determination Questions (GAO AR Tab 162) at 2-3.

101. Moreover, as part of corrective action, TriWest did not revise any aspects of its proposal aside from its Factor 4 submission to identify or allocate work scope for small businesses, yet it purportedly added over ██████ dollars in subcontracting spend and over ██ new small business subcontractors. But at least ████████ of the revised subcontracting plan dollars are going directly to other-than-small businesses that TriWest impermissibly excluded from consideration in its initial proposal. *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 7; TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 10, 12.

102. And, as TriWest did not revise any aspects of its proposal aside from Factor 4, the addition of new small businesses created fundamental inconsistencies between TriWest's technical approach and its Factor 4 proposal, because according to TriWest, "[n]early ████ of [its] identified small businesses support a specific Statement of Work area in Section C." TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 10. Without revising its technical approach to account for the addition of ██ small businesses, there is no evidence that the newly added small businesses are supporting TriWest's response to the Statement of Work. Moreover, any change to TriWest's proposed "team" and subcontractors must be reflected accurately and consistently throughout its proposal.

103. Finally, TriWest also admitted to the improper reliance on significant and impermissible exclusions for "non-biddable costs" including for its ████████████

██████████████.  TriWest – Response to EN 02 & Submission of Revised Small Business

Plan (GAO AR Tab 150) at 10; TriWest – Response to Contractor Responsibility Determination

Questions (GAO AR Tab 162) at 3-4.

104.    In its past performance proposal, TriWest relied on three of its own past

performance references:  (1) VA Patient-Centered Community Care ("PC3") contract with

performance starting in 2013; (2) VA Community Care Network ("CCN") Region 4 ("R4")

contract with performance starting in 2019; and (3) VA CCN Region 5 ("R5") contract with

performance starting in 2020.  TriWest – FPR – Volume III (GAO AR Tab 104) at 6.

105.    The subcontracting reports for the PC3, R4, and R5 contracts identify the same

subcontracting plan administrator (███████████) as identified in TriWest's T-5 small business

subcontracting plan.  *Id.* at 72-83.

106.    Although TriWest ████████████████████████████████████

████████████████████████, based on the information TriWest

provided, "[o]verall, the [Past Performance Evaluation Team ("PPET")] assessed the Offeror to

have satisfactory performance in meeting small business subcontracting goals."  TriWest PPET

Report with Individual Contract Reviews (GAO AR Tab 120) at 11.

107.    As TriWest admitted to relying on erroneous exclusions of other-than-small

business subcontracting dollars from its subcontracting denominators ████████████

████████████████████████████████, TriWest misrepresented far

stronger small business participation than its performance under the proper measurements.

### TriWest's Failure to Provide a Required Letter of Commitment

108.    In order to ensure that offerors were, in fact, able to rely on the provider networks

of other entities identified in their proposals, the RFP required that offerors include a letter of

commitment for every parent or leased network they planned to use:  "If the Offeror proposes to use an existing parent company network or leased network, the Offeror **shall attach a letter of commitment** signed by the network owner indicating that the network identified in the proposal will participate in or join the Offeror's TRICARE network."  Ex. 1, Conformed RFP, at L17 (GAO AR Tab 87).

109.    DHA committed in Section M of the RFP to evaluate the submission of required letters of commitment: "If the Offeror proposes to use any parent-entity networks or leased networks, the Government will evaluate the letter(s) of commitment signed by the cognizant network owner(s) to assess the readiness/willingness of the owner(s) to participate in or join the Offeror's TRICARE network."  *Id.* at M6.

110.    The RFP provided that any offeror that failed to submit any of the information required by the RFP could be considered "materially non-compliant," which could make the offer "ineligible for contract award."  *Id.* at L12.

111.    TriWest proposed to rely upon the network of Blue Cross Blue Shield of Alabama ("Alabama BCBS").  TriWest – FPR – Volume II (GAO AR Tab 103) at 5.  Although the state of Alabama is not in the TRICARE West region, Alabama BCBS' network is not solely in Alabama—rather, it covers 840,000 individuals nationwide *outside* of Alabama and has a "growing national footprint."  BCBS of Alabama, Company Overview.[6]  Additionally, statements by TriWest and Alabama BCBS—both pre-award and post-award—demonstrate that TriWest planned to use Alabama BCBS to support the T-5 West Region contract, and TriWest's own proposal submission to DHA during corrective action discussions affirmatively identified

---

[6] *Available at* https://www.bcbsal.org/web/about/overview.html.

Alabama BCBS as an "Affiliated Network Subcontractor."  TriWest – Response to EN 01 (GAO

AR Tab 146) at 11.

112.    Despite that TriWest proposed BCBS Alabama as a network subcontractor,

TriWest failed to include a mandatory letter of commitment from Alabama BCBS in its proposal,

rendering the proposal materially noncompliant and ineligible for award.

### *Unexplained Risks in TriWest Technical Approach*

113.    "TriWest Healthcare Alliance Corp." (TriWest) was "the Offeror" for purposes of

this procurement.  However, TriWest does not have its own network capable of meeting the

requirements of the T-5 procurement.

114.    Instead of offering a compliant network, TriWest took a unique and extremely

risky technical approach to performing the requirements of the T-5 contract.  Specifically,

TriWest proposed to cobble together a patchwork of numerous small networks of its

subcontractors, consisting mainly of independent state and local BCBS associations (collectively

referred to herein as "the Blues").

115.    TriWest took a similar approach in performing the VA PC3 contract and the

follow-on Community Care Network ("CCN") contract.  However, the technical requirements of

the PC3 and CCN contracts are significantly less complex than the T-5 contract, and the material

differences between PC3/CCN and T-5 demonstrate that, *even if* TriWest had a perfectly

functioning PC3/CCN network (it does not—as discussed below, TriWest has encountered

significant performance problems even on this much simpler contract), there is significant risk

that it is not feasible for TriWest's PC3/CCN approach to function under the requirements of the

T-5 contract.

116.    The RFP required that DHA's "evaluation . . . include . . . the Offeror's *demonstrated experience* in performing tasks (*including experience in performing a proposed approach*, method, or process))," Ex. 1, Conformed RFP, at M4 (GAO AR Tab 87), and that DHA would "evaluate the *effectiveness* of the Offeror's proposed approach . . ." *Id.* at M5.

117.    The RFP also included multiple requirements that the Government evaluate offerors' proposals with respect to access-to-care standards:

- M.7.2.1.1.d:  "The Government will evaluate the effectiveness of the Offeror's proposed approach for developing and maintaining a provider network that . . . Meets TRICARE access to care standards as defined in 32 CFR 199.17(p)(5)."

- M.7.2.1.1.f:  "The Government will evaluate the effectiveness of the Offeror's proposed approach for developing and maintaining a provider network that . . . [c]ontinuously maintains compliance with TRICARE access to care standards as defined in 32 CFR 199.17(p)(5)."

- M.7.2.1.2.f:  "The Government will evaluate how effectively the Offeror's network model . . . [u]ses access to care appointment wait time and drive/travel time standards for the TRICARE benefit (as defined in 32 CFR 199.17(p)(5))."

- M.7.2.1.3.2:  "The Government will evaluate the size and extent of the Offeror's proposed new network build . . . and the adequacy of the evidence the Offeror provides demonstrating that it is and will be authorized to use as part of its TRICARE network any existing network (proposed as part of its new network build) not owned by the Offeror."

118.    In addition to these provisions, DHA was also required to evaluate the technical risk of each offeror's proposal.  DOD's Source Selection Guide requires that evaluations such as those here that include a technical evaluation factor shall also consider Risk, separately or in conjunction with technical factors.  *See Department of Defense Source Selection Procedures*, Apr. 1, 2016, at 26.[7]  The Source Selection Guide explains that Risk can be evaluated in one of

---

[7]     *Available at* https://www.acq.osd.mil/dpap/policy/policyvault/USA004370-14-DPAP.pdf.  Although DOD issued an updated Guide effective September 1, 2022, DHA stated in the debriefing that it relied upon the April 1, 2016 version of the Guide.

two ways: as a separate Risk rating assigned at the technical factor or subfactor level; or as one aspect of the technical evaluation, inherent in the technical evaluation factor or subfactor ratings. *Id.* Here, DHA adopted the former approach for the T-5 Solicitation. As a result, the RFP required that, in addition to the Technical adjectival ratings of Outstanding, Good, Acceptable, Marginal, or Unacceptable, the evaluators were also to perform a *separate* Risk evaluation and "assign a risk rating for each of the Technical/Risk subfactors as described in Table M.6.2." Ex. 1, Conformed RFP, at M4 (GAO AR Tab 87).

119. Section M of the RFP required that "[t]he risk evaluation **will include**, but not be limited to, an evaluation of the Offeror's proposed approach, method, or process for completing tasks **and the Offeror's demonstrated experience in performing tasks** (including experience in performing a proposed approach, method, or process)." *Id.* (§ M.6.2) (emphasis added). In addition, the RFP required that DHA assess whether proposals included sufficient detail to "**substantiat[e] the validity of stated claims.**" *Id.* at L3 (emphasis added). These separate risk evaluations were required to lead to Risk ratings being assigned based on the potential to "cause disruption of schedule, increased cost or degradation of performance." *Id.* (incorporating risk rating definitions).

120. However, DHA failed to comply with these evaluation requirements. Instead, it unquestioningly credited TriWest's proposal to rely primarily upon its PC3/CCN networks without assessing whether the PC3/CCN networks demonstrated experience in performing the approach TriWest proposed here, and without evaluating the effectiveness of relying on the materially different (and significantly less complex) PC3/CCN networks. If DHA had performed the analysis required by the RFP, it would have found numerous risks, weaknesses, and deficiencies associated with TriWest's plan to use its patchwork of PC3/CCN networks (and

additional subcontractor networks not part of the PC3/CCN program) to perform the T-5 contract.

121.    ***First***, there is significant risk that the majority of the providers in TriWest's patchwork of PC3/CCN networks will refuse to join the T-5 network.  This is because the reimbursement rates for providers under the PC3/CCN contract are significantly higher than the reimbursement rates under T-5.  TriWest's PC3/CCN providers have already negotiated rates with TriWest and its subcontractors that are ***higher*** than the rates TriWest will be able to reimburse providers under T-5.  Specifically, the PC3/CCN contracts generally reimburse providers at the established Medicare rates ***without any additional discounts.***  *See, e.g.,* https://www.va.gov/COMMUNITYCARE/revenue_ops/Fee_Schedule.asp (Under the CCN contract, "Department of Veterans Affairs (VA) reimburses hospital care, medical services and extended care services up to the maximum allowable rate.  The maximum allowable rate is generally the applicable Medicare rate published by the Centers for Medicare and Medicaid Services (CMS).")  In contrast, under the T-5 contract, TriWest will have to convince these same providers (including providers in rural areas who may be accustomed to charging increased rates)[8] to offer the same services but at a discount in order to meet TriWest's contractually binding T-5 Guaranteed Network Discount.

122.    TriWest's proposal demonstrates that providers in its (and its subcontractor's) networks will have the option to decline or "opt-out" of joining the lower-paying T-5 network.  Specifically, TriWest's proposal states that approximately ▮▮ of providers will be issued an

---

[8]    TriWest has previously taken the position that under the CCN contract, offerors would need to propose prices ***in excess of the Medicare reimbursement*** in highly rural care areas and scarce medical specialist services in order to secure providers there.  *See TriWest Healthcare Alliance Corp.,* B-415222.3 *et al.*, May 2, 2019, 2019 CPD ¶ 152.

agreement amendment that attempts to add the lower-paying T-5 network, which providers have

the option to reject.  With respect to the other ███ of providers in TriWest's proposed T-5

networks, TriWest acknowledged that █████████████████████████████████████████

█████████████████████████████████████  TriWest – FPR – Volume II (GAO

AR Tab 103) at 12.

123.    The TET was aware that none of TriWest's providers were certain to join the T-5

network and that each of the providers would have the ability to either opt-out or to decline the

attempt to negotiate a new agreement adding the lower-paying T-5 program.  *See* DHA Supp.

ML, Ex. 2, Wuerdeman Decl.

124.    Although the TET knew that all of TriWest's providers had the ability to decline

joining the lower-paying T-5 network, DHA failed to recognize or evaluate the likelihood that

they would do so.  Moreover, DHA failed to analyze the substantial risk to the T-5 program in

the event that a high percentage of providers refused to join the T-5 network.

125.    In addition to failing to analyze the risks of providers declining to join TriWest's

T-5 network, the TET failed to even inform the SSEB, SSAC, or the SSA that providers in

TriWest's proposed T-5 network had the *ability* to opt-out or decline to join the T-5 network.

Rather, the contemporaneous documentation shows that the final TET report, on which the

selection decision was based, led the SSA and others to believe that TriWest had the "unilateral"

ability to amend provider agreements to add the T-5 program.  For example, the final TET report

praised TriWest's proposal, stating that TriWest had "***unilateral*** amendment clauses in-place for

███ of the current providers, applicable to all provider types."  TriWest – Subfactor 1 – Final

Technical Evaluation_M.7.2.1 (GAO AR Tab 126) at 11 (emphasis added); *see also id.* at 7, 16,

22, 40, 49.  The report stated that TriWest's use of "unilateral amendment clauses" was "a

thorough approach to meeting the requirement for developing and maintaining a provider network." *Id.*; *see also id.* at 22 (citing the "unilateral agreements" as a basis for concluding that TriWest demonstrated an "exceptional" approach); *id.* at 49 ("The TET determined the ability of the Offeror to utilize unilateral amendments to rapidly build the network in the West Region is likely to reduce risk through exceeding timelines for provider-loading prior to SHCD").

126.    Moreover, DHA failed to analyze the risk that providers ***would*** opt out of TriWest's purported "unilateral" amendment.  TriWest's proposal stated that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

TriWest – FPR – Volume II (GAO AR Tab 103) at 12.

127.    However, there are several significant aspects of this statement that DHA failed to analyze.  For example, DHA failed to consider the fact that TriWest's experience using these "unilateral" amendments ████████████████████████████████████████████.  Thus, this experience has no utility in demonstrating that providers would accept the ***lower*** rates of the TRICARE contract because TriWest's "experience" with these clauses has never been tested in a situation where TriWest is attempting to add a plan that offers significantly lower reimbursement rates than the provider is currently receiving.

128.    TriWest's proposal contained no plan for, or demonstrated experience with, having providers accept network provider discounts significantly below the higher reimbursable rates under CCN.  This failure by itself constitutes a significant risk to performance.  As a result, DHA's failure to analyze this risk was unreasonable.

129.    In addition, TriWest's proposal noted that the company first began inserting the

"unilateral amendment clause" in its provider agreements in ▮▮—provider agreements entered

into prior to ▮▮ (which represent about ▮▮ of TriWest's provider agreements) do not have

such clauses, and therefore, these contracts would need to undergo bilateral negotiations to add

the T-5 network.  *Id.* at 12.  DHA failed to recognize that TriWest's percentages of acceptance

TriWest claims to have experienced under other contracts—***even if*** transferrable to this

contract—indicate that TriWest will still have substantial work to do in negotiating the addition

of the T-5 network.  In other words, DHA failed to recognize the high number of providers that

would likely ***not*** be automatically added to the contract.  Specifically, TriWest indicated that

approximately ▮▮ of its provider agreements do ***not*** contain the "unilateral" amendment clause

and would require bilateral negotiation in order to add the T-5 network.  *Id.*  With a purported

network size of ▮▮▮, *see* SSAC Report (GAO AR Tab 139) at 17, this means there are at

least ▮▮▮ providers in the network with whom TriWest will need to engage in bilateral

negotiations.

130.    In addition, TriWest represented that, since it began adding the "unilateral"

amendments in ▮▮▮▮▮▮▮▮▮ TriWest – FPR – Volume II (GAO AR

Tab 103) at 12.  The Contracting Officer interpreted this to mean the ▮▮▮▮▮

have accepted.  *See* COSF at 35.  Thus, ***even if*** the level of acceptance under T-5 is consistent

with TriWest's historical CCN experience (which, given the significantly lower reimbursement

rates TriWest proposed under T-5, is unlikely), this could leave as many as ▮▮▮▮

▮▮▮▮ ***additional*** providers potentially not added to TriWest's network via the

amendment, for a total of ▮▮▮▮▮▮▮▮[9] *potentially not added via the "unilateral"*

*amendment with whom TriWest will need to engage in negotiations*.  This number is nearly

certain to be significantly higher given that providers are much less likely to accept the lower

reimbursement rates of T-5 than they have been to accept the more generous rates under the

CCN and PC3 contracts.  Rather than recognizing these facts as a technical risk and a significant

technical weakness, DHA *praised* TriWest for this aspect of its proposal, evidencing a fatal

misunderstanding of TriWest's ability to add providers in its new TRICARE network subject to

TriWest's proposed network provider discounts.

131.    DHA should have recognized—but irrationally failed to recognize—that HNFS'

demonstrated experience in building a network of providers willing to accept the discounted

TRICARE reimbursement rates was a significant discriminator between HNFS and TriWest.

132.    In addition, DHA engaged in unequal and disparate treatment in evaluating the

offerors' proposals.  Specifically, DHA expressed concern when evaluating HNFS' proposal that

low provider reimbursement rates "will negatively impact contract performance" because "[t]he

number and quality of the healthcare providers may be impacted."  Unbalanced Price Report

(GAO AR Tab 64) at 9.  Specifically, DHA stated that "Healthcare providers may not sign on to

HNFS' network due to the . . . lower fees paid to providers."  *Id.*  DHA further opined that

"[o]nly lower quality healthcare providers may sign on in response to the proposed" lower

reimbursement rates, and "[t]here may be less access to healthcare professionals with fewer

providers signing onto the network – longer wait times for appointments and/or longer commutes

for appointments by beneficiaries."  *Id.*; COSF at 105.

---

[9]    This reflects the ▮▮▮▮▮▮ providers whose agreements do not contain the "unilateral"
amendment clause plus the ▮▮▮▮▮▮ providers who may opt out based on TriWest's historical
levels of opt outs.

133.    In contrast, DHA took the exact opposite position with respect to the same concern (the risk that lower provider reimbursement rates would negatively impact contract performance by decreasing the number and quality of providers) in TriWest's proposal. Contrary to its position when evaluating HNFS, DHA took the position with respect to TriWest that it was not required or permitted to evaluate the likelihood of "getting network providers to agree to payment discounts," with respect to the risk that TriWest would be unable to convince providers to accept lower reimbursement rates:

> [I]f the awarded contractor couldn't get the discounts it guaranteed, then the result would *not* be that the contractor didn't have a network. The contractor would just have a network with higher paid providers—and a hole in its pocketbook from paying the Agency's negative incentive. Under this construct, the Agency didn't need to scrutinize the offerors' tactics for negotiating payment rates with their network providers; and, hence, the Agency didn't include the topic in its evaluation scheme.

DHA Supp. LM at 27.

134.    In addition, the TET incorrectly led the SSA to believe that TriWest had already "contacted and credentialed ██ of the providers in the West Region."  TriWest – Subfactor 1 – Final Technical Evaluation_M.7.2.1 (GAO AR Tab 126) at 49.  In the heat of GAO bid protest litigation, and in recognition that this statement was false, DHA attempted to rewrite the record to alter the statement, claiming that the TET "understood" that TriWest had not contacted and credentialed ██ of the providers in the West Region, but rather, that ██ of TriWest's CCN network providers' contracts include an amendment clause that allows TriWest to issue an amendment adding T-5 and giving these providers the ability to opt out of the T-5 network. DHA Supp. LM at 32.  However, the selection decision was based upon the written evaluation reports, and there is no evidence that the SSA based the selection decision on what the TET "understood" TriWest's proposal to mean, rather than what the final TET report actually said.

135.    **Second**, DHA's decision to credit TriWest's proposal to rely primarily upon its PC3/CCN networks ignores the fact that the PC3/CCN contract does not cover the entirety of the TRICARE T-5 West region—it is missing 12 states that are part of the T-5 West Region: Illinois, Wisconsin, Arkansas, Missouri, Louisiana, Oklahoma, Kansas, Nebraska, Iowa, Minnesota, North Dakota, and South Dakota.

136.    **Third**, DHA's decision to credit TriWest's proposal to rely primarily upon its PC3/CCN networks ignores the fact that the network adequacy and access-to-care requirements are materially stricter under T-5, and the composition of the network and the geographic location of providers directly determines how far a beneficiary must travel to obtain care.[10]  T-5 wait-time requirements are also more stringent—while the CCN contract allows for up to 30 days for routine care appointments, the T-5 contract allows a maximum wait time of just one week for a routine visit.[11]

137.    Similarly, some if not all of TriWest's subcontractors also hold their providers to appointment availability standards that are much more lenient than, and fail to comply with, the T-5 RFP's requirements.[12]

---

[10]    For example, while the CCN contract allows drive times from 30 minutes to 100 minutes, depending on type of appointment, the T-5 Solicitation (pursuant to 32 C.F.R. § 199.17(p)(5)) requires that travel time may not exceed 30 minutes.  *See, e.g.*, GAO, "Veterans Community Care Program: VA Needs to Strengthen Its Oversight and Improve Data on Its Community Care Network Providers," November 2022 at 8, *available at* https://www.gao.gov/products/gao-23-105290 (noting that under the CCN contract, allowable drive times include 45 minutes for primary care, depending on the location of the veteran); 32 C.F.R. § 199.17(p)(5)) (the standard incorporated into the T-5 RFP, which requires that travel time may not exceed 30 minutes).
[11]    *Compare, e.g.*, GAO, "Veterans Community Care Program: VA Needs to Strengthen Its Oversight and Improve Data on Its Community Care Network Providers," *supra* at 8, *with* Ex. 1, Conformed RFP, at M5 (GAO AR Tab 87), and 32 C.F.R. § 199.17(p)(5).
[12]    *See, e.g.*, Blue Shield of California Provider Manual Updates, Oct. 14, 2022 (stating that the access to care standard for routine Primary Care Physician appointments is 15 business days).

138.     *Fourth*, DHA's decision to credit TriWest's proposal to rely primarily upon its PC3/CCN networks ignores the fact that the requirements of the T-5 contract are significantly more complex than the requirements of the CCN/PC3 contract.  T-5 significantly expands the TRICARE contractor's role in network management and overall administration of the program, for example:

a.   Under the PC3/CCN contracts, the VA refers all care to the network.  In contrast, TRICARE subcontractors are entirely responsible for processing and approving referral and authorization requests.  This involves, among other things, seamless integration with DoD's referral-management system, translation of information from the referring military physician into standard diagnosis and procedure codes, benefit verification through appropriate medical-review screening, and communicating approved referrals to the beneficiary, MTF and network provider, all while understanding the nuanced differences between TRICARE Prime and TRICARE Select beneficiaries.

b.   Under PC3/CCN, TriWest does not need to make eligibility or enrollment determinations.  In contrast, TRICARE contractors are responsible for accomplishing enrollment, including collection and accounting of enrollment fees; assignment to a primary care manager (for Prime enrollees); determination of eligibility through real-time integration with the Defense Eligibility Enrollment Reporting System ("DEERS"); processing enrollment updates and dis-enrollments; and supporting open season every year.  The T-5 contractor must also make enrollment determinations when adjudicating claims.  This necessitates a claims-processing system with a much higher level of sophistication than needed under CCN.

c.   Under PC3/CCN, the VA provides all other health insurance ("OHI") information to TriWest.  HNFS GAO Protest Ex. 24, CCN RFP at 12.7.1.  In contrast, under TRICARE, DHA does not provide the contractor with OHI information for beneficiaries; the contractor must query external sources for OHI, integrate that information into the claims processing system, and update DEERS with up-to-date and accurate OHI information.

d.   Under PC3/CCN, TriWest does not pay out-of-network claims; instead, out-of-network claims are sent to the VA for processing and payment.  In contrast, under TRICARE, the contractor is responsible for paying out-of-network claims.

e.   Under PC3/CCN, TriWest is responsible for providing veteran care on an episode-by-episode basis.  The episodic nature of this care limits TriWest's role in "medical management" to appointment scheduling and discharge planning.  In contrast, under TRICARE, the contractor establishes an integrated care model that promotes entire beneficiary population health.  This adds significant complexity to TRICARE medical-management activities, which include, for example, using predictive

43

analytics to explore and develop health and wellness programs, chronic condition management, disease management, etc.

f. Under PC3/CCN, TriWest has no responsibility for Utilization Management ("UM") or review activities, because the VA controls all utilization of the purchased care network. In contrast, under TRICARE, UM is a major component of contract performance. Among other responsibilities, the contractor must deploy a comprehensive UM program (prospective, concurrent, and retrospective) that is tailored to the complexities of the TRICARE benefit. This extensive process involves deployment of UM software; employment of clinical UM staff to perform medical necessity reviews in accordance with TRICARE regulations, policies, and evolving standards of practice; obtaining peer review of medical-necessity determinations; and communication with stakeholders (beneficiaries, MTFs, DHA, providers).

139. Moreover, despite the fact that the PC3/CCN contracts involve significantly simpler requirements than the T-5 contract, TriWest has been unable to meet even these simpler requirements, as discussed below. Despite this unambiguous information indicating that TriWest has no "demonstrated experience" successfully performing its proposed approach, DHA failed to analyze the "effectiveness" of TriWest's T-5 proposal in light of this information.

140. *Fifth*, DHA's decision to credit TriWest's proposal to rely primarily upon its PC3/CCN networks ignores that many of TriWest's PC3/CCN network providers do not meet the T-5 standards for specialty accreditations. Although these network providers may have URAC accreditation, they do not meet T-5-specific requirements that are tailored to specialty type, such as the requirements for behavioral health providers and autism care providers.[13]

141. Despite the fact that the PC3/CCN contracts are significantly simpler, DHA failed to acknowledge that TriWest has been unable to perform even these simpler requirements acceptably, or to analyze the "effectiveness" of TriWest's proposal to rely on its PC3/CCN

---

[13] The T-5 RFP incorporates the TRICARE Policy Manual ("TPM"), which includes the requirements for birthing centers, psychiatric hospitals, intensive outpatient programs, and many other types of services, in addition to discussing accreditation requirements generally).

networks in light of the fact that these networks have been unable to satisfy even the much less

complex requirements of the PC3/CCN contracts.

142.    For example, in a report issued in November 2022, GAO examined TriWest's

performance under its CCN contract.  GAO found that, even after the CCN contract had been

fully implemented,[14] TriWest's network—the same network proposed here—consistently failed

to meet the VA's less stringent access-to-care requirements.[15]  As shown in the chart below, only

30.2% to 48.8% of TriWest's claims from November 2021 to March 2022 met VA's

performance standard for appointment availability for primary care.  TriWest's ability to meet

the VA's performance standards for other types of care was also deficient—ranging from 62.1%

to 69.3% for specialty care, 62.7% to 66.7% for general dental appointments, 63.1% to 69.6% for

specialized dental appointments, and 56.6% to 88.4% for complementary and integrative health

services.[16]  This deficient performance was recent, encompassing performance from November

2021 to March 2022.

---

[14]    GAO, "Veterans Community Care Program: VA Needs to Strengthen Its Oversight and
Improve Data on Its Community Care Network Providers," November 2022, at 37, Appendix I
n.1 (emphasis added), *available at* https://www.gao.gov/products/gao-23-105290.

[15]    Although TriWest is responsible for Regions 4 and 5, GAO's report did not address
Region 5 (Alaska), because its drive-time and appointment availability standards are different
from those in Regions 1 through 4.  *Id.* at 1 n.3.

[16]    *Id.* at 61.  GAO noted that under TriWest's Region 4 contract, the performance objective
is 70 percent of claims meeting the appointment-availability standard.  *Id.* at 12 n.24.

**Table 9: Community Care Network (CCN) Region 4 Aggregated Network Adequacy Performance Report Data Compared against VA's Routine Appointment Availability Standard by Care Type, November 2021 to March 2022**

| CCN region | Types of care | Total number of claims | Range of percentages of claims that met VA's standard each month |
|---|---|---|---|
| Region 4 | Primary care | 11,115 | 30.2 to 48.8 |
| | Specialty care | 573,998 | 62.1 to 69.3 |
| | General dental | 32,963 | 62.7 to 66.7 |
| | Specialized dental | 3,247 | 63.1 to 69.6 |
| | Complementary and integrative health services | 3,213 | 56.6 to 88.4 |

Source: GAO analysis of Department of Veterans Affairs (VA) network adequacy performance reports. | GAO-23-105290

[17]

143.    TriWest's inability to meet even CCN's less stringent access-to-care standards led the VA to require TriWest to submit a corrective-action plan "related to deficiencies identified against the drive-time standards." *Id.* at 13.  Moreover, TriWest's inability to meet the access-to care standards is even more troublesome in light of the significantly lower volumes of claims it was processing.  For example, between October 2021 and February 2022, HNFS processed nearly eighty times (or 8000%) more primary-care claims and almost ten times more specialty care claims than TriWest, yet HNFS achieved significantly higher success in meeting the relevant access-to-care standard:[18]

---

[17]    *Id.* at 61.
[18]    *See id.*, Table 9 (providing data for TriWest); the numbers for HNFS are based on an analysis of HNFS' historical claims data available to DHA.

| | Primary Care | | | Specialty Care | | |
|---|---|---|---|---|---|---|
| | Claim Volume | Appointment Availability Standard[19] | % Meeting Standard | Claim Volume | Appointment Availability Standard | % Meeting Standard |
| TriWest[20] | 11,115 | 30 days[21] | 30.2-48.8% | 573,998 | 30 days[22] | 62.1-69.3% |
| HNFS[23] | ███ | ███ | ███ | ███ | ███ | ███ |

144.    DHA was aware of this information at the time that it made the decision to re-award to TriWest in April 2023, but DHA failed to consider it as required by the RFP. Moreover, even prior to issuance of the GAO report, DHA was aware of the significant differences between the PC3/CCN contracts and T-5 and failed to consider and analyze these differences in evaluating TriWest's proposal, including evaluating TriWest's "demonstrated experience in performing tasks (including experience in performing a proposed approach, method, or process))," and "the *effectiveness* of [TriWest's] proposed approach . . . ." Ex. 1, Conformed RFP, at M4, M5 (GAO AR Tab 87) (emphasis added).

145.    *Finally*, more generally, DHA irrationally failed to evaluate the likelihood that TriWest's patchwork of subcontractor networks will not meet the RFP's requirements.

146.    As noted above, the RFP required DHA to evaluate the "effectiveness" of the Offeror's proposed approach for developing and maintaining a network compliant with the RFP's terms, including its access to care standards. *See id.* at M5.

147.    TriWest represented to the Government that it was offering an "existing Federal Network." *See, e.g.,* TriWest – FPR – Volume II (GAO AR Tab 103) at 12; *see also id.* at 11,

---

19    *Id.* at 69.
20    *Id.*
21    *Id.* at 17.
22    *See id.*
23    Based on an analysis of HNFS historical claims data.
24    For a routine visit, wait time is not to exceed 1 week.  32 C.F.R. § 199.17(p)(5).
25    For specialty care and well-patient visits, wait time is not to exceed 4 weeks.  *Id.*

13, 22, 31.  In reality, however, TriWest planned to rely on the same amalgamated solution that it provides under its CCN/PC3 contracts—numerous independent networks bolted on to its own smaller TriWest network, patched together in an attempt to create the semblance of a whole.  The record reflects that DHA repeatedly took TriWest at its word without questioning or fully understanding its representations that it could meet, and in many cases exceed, the RFP's requirements and thus never truly evaluated the "effectiveness" of the proposed solution.  Aside from demonstrating the vastly different standards to which DHA held TriWest as compared to HNFS, DHA's blind acceptance of TriWest's promises was unreasonable in light of the company's inability to meet even the less stringent standards of the CCN contract.  TriWest never clearly or consistently defines what it means by its "existing Federal Network"—a term that TriWest morphs at its convenience throughout its proposal.  To be clear, TriWest has its own provider network and also relies on leasing arrangements to rely on the networks of a vast list of other nonprofit entities.  It does not clearly explain its "Federal Network" and which entity is providing which network in which state(s).  TriWest does include a map of its proposed "local" network, which reveals the "TriWest" network covering only the state of Alaska:



*Id.* at 13.

148.    TriWest repeatedly referenced its purportedly large numbers of providers and geographic coverage throughout the pages of its proposal, but it never explained precisely whose network they come from beyond the map above.  And it appears that DHA interpreted this "existing Federal Network" to encompass significantly more than TriWest's own resources.

149.    This basic misunderstanding impacted not only the evaluation of network size, but many components of the evaluation, including DHA's understanding even of what "network" was accredited under URAC.  Section C.2.1.12.1 of the RFP provides, "The Contractor shall maintain accreditation by a national accrediting organization of its healthcare network in all geographic areas of responsibility throughout the life of this contract and all exercised options. Network accreditation shall be from a national body that considers quality benchmarks for network management, provider credentialing, quality management and improvement, and consumer protection."  Ex. 1, Conformed RFP, at C4 (GAO AR Tab 87).

150.    Similarly, Section M.2.7.1.1 of the RFP provides that under Subfactor 1, DHA will evaluate "the effectiveness of the Offeror's proposed approach for developing and maintaining a provider network that . . . [i]s accredited by a leading health quality measurement organization."  *Id.* at M5.  Yet, in the evaluation, DHA unreasonably accepted TriWest's URAC network accreditation alone without addressing how, if at all, its ▆▆▆▆▆▆▆▆▆▆ were accredited or would comply with the applicable requirements.  TriWest – Subfactor 1 – Final Technical Evaluation_M.7.2.1 (GAO AR Tab 126) at 6.  The conclusion that "TriWest's" accreditation was a proxy for the entire "Federal Network" was improper and unreasonably disregarded the added risk with TriWest's multinetwork approach.

151.    Under a rational evaluation of TriWest's proposal, DHA would have downgraded TriWest's proposal with respect to both technical merit and risk.  Its failure to do so was arbitrary and capricious.

### HNFS' Two Technical Weaknesses and DHA's Discussions With HNFS

152.    DHA assigned only two weaknesses to the entirety of HNFS' proposal, both under Factor 1, Technical/Risk.

153.    *First*, under Subfactor 1, Network Management, the RFP provided that DHA would evaluate:

> [T]he size and extent of the Offeror's proposed new network build (as described in Attachments L-9e and/or L-9w, depending on which region is proposed) and the adequacy of the evidence the Offeror provides demonstrating that it is and will be authorized to use as part of its TRICARE network any existing network (proposed as part of its new network build) not owned by the Offeror.  If the Offeror proposes to use any parent-entity networks or leased networks, the Government will evaluate the letter(s) of commitment signed by the cognizant network owner(s) to assess the readiness/willingness of the owner(s) to participate in or join the Offeror's TRICARE network.

Ex. 1, Conformed RFP, at M6 (§ M.7.2.1.3.2) (GAO AR Tab 87).

154.    As per the RFP criteria, DHA was only to assess "the adequacy of the evidence" that an offeror provided for its proposed use of an existing network that is "not owned by the offeror." *Id.*

155.    HNFS' proposal and Attachments L-3w and L-9w demonstrated the size of the current HNFS network and the new network build required in the T-5 West Region.  *See* HNFS FPR, Vol. II (GAO AR Tab 107) at II-23; *see also* HNFS FPR, Vol. II, Attach. II-2 (GAO AR Tab 108); HNFS FPR, Vol. II, Attach. II-3 (GAO AR Tab 109).  In accordance with the RFP, HNFS stated that "[t]o meet the network build requirement, HNFS will build a network by

███████   **REDACTED VERSION**

███████████████████████████████████████████████████████

██████████████████████████.”  HNFS FPR, Vol. II (GAO AR Tab 107) at II-29.

HNFS' proposal clearly established HNFS' ability to ██████████████ and explained

that "HNFS will ████████████████████████████████████████

████████████████████████████████████████.” *See id.* at

II-27.

      156.     However, in the final evaluation, DHA assessed that there was a "[l]ack of

evidence of HNFS' ability to ██████████████████████.”  SSDD (GAO

AR Tab 141) at 10.  The SSA summarized DHA's finding as follows:

> HNFS' proposal has a weakness in SF-1 relating to the ███████
> ████████████████████████████████████ The TET identified
> the █████████████████████████████████████,'
> The TET stated in its report that Based on the information
> provided by the Offeror, the TET was unable to validate that this
> approach in combination with the other network build approaches
> it describes for the ██████████ would result in a network
> sufficient in number, mix and geographic distribution to meet ATC
> standards.

*Id.*

      157.     The SSA further stated that "even though [Weakness 1] was determined to be a

low risk, it does have the potential to impact ██████ TRICARE beneficiaries," and noted

that both the Source Selection Advisory Council ("SSAC") and the SSA concurred that this is a

weakness.  *Id.*

      158.     ***Second***, under Subfactor 2, in accordance with RFP Section M.7.2.2.4.e, DHA

was required to evaluate HNFS' "proposed approach for offering timely in-home CM services to

beneficiaries that reduce the risk of readmission and for carrying out first in-home visits to

████████████████████████████████████████████████████████

beneficiaries within 48 to 72 hours post discharge from inpatient care."  Ex. 1, Conformed RFP,

at M9 (§ M.7.2.2.4) (GAO AR Tab 87).

159.    In the final evaluation, DHA identified a Weakness ("Weakness 2") in HNFS'

approach to providing in-home case management services, as follows:

> My assessment of the TET's concern is that HNFS is ███████
> ███████████████████ and that the requirements that are likely
> to require ████████
> ███████████████ The TET's concern as described
> does not seem to be with the adequacy of the approach, but rather
> with the ████████ of the execution.  In other words, this
> introduces risk to unsuccessful execution rather than an
> inadequately described approach.  I also note that the TET
> describes the SF risk as Low, meaning that normal contractor
> effort and normal Government monitoring will likely be able to
> overcome any difficulties. Therefore, I concur with the SSAC that
> the approach is adequate but there is some increased risk of
> unsuccessful contract performance which could have a range of
> negative outcomes from adverse care to increased costs.

SSDD (GAO AR Tab 141) at 18.

160.    DHA assessed these weaknesses to HNFS in the final evaluation despite the fact

that DHA engaged in discussions with HNFS and gave HNFS the impression that all issues with

its proposal had been resolved prior to final proposal submission.

161.    With regard to Weakness 1, in the very first round of discussions with HNFS,

DHA issued EN 8, which stated in relevant part:

> **EN 8**:
>
> Subfactor: 1 – Network Management
>
> Subject: ████████████████████████
>
> Description of Issue: The proposal contains inadequate evidence as
> to the size and extent of the ██████████████████
> ████████ .
> This is a significant weakness of the proposal.
>
> Request: Identify the approach the Offeror will employ to build a
> network ██████████████ in accordance with the

timelines required, given what appears to be ██████████████

HNFS – Round 1 – Discussions – Competitive Range and Evaluation Notices from CO (GAO
AR Tab 56) at 20-22 (emphases added).

162.     HNFS addressed this concern in its March 18, 2022 revised proposal, *see* HNFS –
Round 1– Discussions – Responses to Evaluation Notices (GAO AR Tab 60), and DHA did not
again raise concerns with HNFS' ████████████████████████

████████████ during the subsequent nine rounds of discussions.  In fact, while DHA asked
dozens of other questions through ENs, including questions tailored to specific aspects of HNFS'
SF-1 solution, DHA never informed HNFS that it had additional concerns related to ████

████████████████████████, or asked HNFS to validate its approach for
████████.

163.     DHA had numerous opportunities to inform HNFS of its concerns.  From the
initial EN issuance date of February 22, 2022, through early June 2022, DHA held eight rounds
of discussions with HNFS.  DHA issued a ninth round of ENs to HNFS on July 6, 2022, and a
tenth round of ENs on July 11, 2022.  *See* HNFS – Round 9 – Discussions, Distributed ENs
(GAO AR Tab 81), EN 22; HNFS – Round 10 – Discussions, Distributed ENs (GAO AR Tab
84), EN 27.  And during those last rounds of discussions the only question DHA asked HNFS on
West Network Build was EN 22, which was on markedly different ████.  Far from alerting
HNFS of DHA's targeted concern with ████████████████████████, EN 22
explicitly identified ████████████████████████████:

The Offeror's proposal does not correlate correctly in ████████████
████████████████████████████████
████████████████████. The Offeror has not provided
the Government sufficient information to determine whether its

████████████████████████████████████████████

██████████████████████████████████████ will result in the adequate
network required by C.2.1.1.1.

HNFS - Round 9 – Discussions, Distributed ENs (GAO AR Tab 81), EN 22.

164.    This EN, which specifically identified ████████████████ as DHA's only

remaining areas of concern, did not in any way indicate that DHA had problems with ████████

███████████████████████████████████████████████████████

████████████████.

165.    With regard to Weakness 2, in the initial round of ENs, DHA issued HNFS EN 13

for HNFS' approach to in-home case management under SF-2.  *See* EN Round 1, West at EN 13,

which stated as follows:

> **EN 13**:
>
> Subfactor: 2 – Clinical Management
>
> Description: The Offeror does not describe how the in-home Case
> Management (CM) services will be completed within 48-72 hours
> post discharge.
>
> Request: "Clarify the Offeror's approach to ensure all beneficiaries
> who are located in the West Region and are eligible for in-home
> services *receive the services within the required timeframe*."

HNFS – Round 1 – Discussions – Competitive Range and Evaluation Notices from CO (GAO
AR Tab 56), EN 13 (emphasis added).

166.    DHA later clarified this concern in EN 34, which DHA issued on April 6, 2022,

after HNFS responded to EN 13:

> **EN 34**:
>
> Subfactor: 2 – Clinical Management
>
> Description:  The Offeror describes a process for ████████████████
> ███████████████████████████████████████████
> ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████.

> Request: "Provide further detail of how the Offeror proposes to meet
> the C.2.4.3. requirement to complete in-home CM visits within 48
> to 72 hours across the Region for all eligible beneficiaries."

HNFS - Round 2 – Discussions, Distributed ENs (GAO AR Tab 61),  EN 34.

167.    After HNFS responded to round two EN 34 on April 13, 2022, DHA did not issue

any further ENs or questions over the remainder of the discussions related to HNFS' ability to

complete the in-home case-management services within the required 48 to 72 hour timeframe.

This was despite the fact that DHA conducted eight additional rounds of discussions over a three-

month period, including discussions regarding distinct areas of concern in SF-2.  *See, e.g.*, HNFS –

Round 5 – Discussions, Distributed ENs (GAO AR Tab 71), EN 39; HNFS - Round 9 –

Discussions, Distributed ENs (GAO AR Tab 81), EN 22.

### Past Performance

168.    Section M.8.1 of the RFP directs that the Government "will evaluate past

performance information, submitted by Offerors in accordance with Section L and obtained

through other sources, to determine how well an Offeror and its first-tier subcontractors have

performed in the past on recent, relevant work."  Ex. 1, Conformed RFP, at M19 (GAO AR Tab

87).  Thus, as is typical of nearly all past performance reviews, recent contract work would be

assessed for relevancy and then, if relevant, for performance quality.  *Id.* at M19 to M20.

169.    As reflected in the RFP and the evaluation itself, respectively, each individual

reference would be assigned its own "Relevancy" and "Quality Summary" rating.  *Id.* at M20;

*see also* HNFS PPET Report with Individual Contract Reviews (GAO AR Tab 123) at 4; SSDD

(GAO AR Tab 141) at 45-46, 52.

170.    Relevancy would be assessed against the following four-tier adjectival rating

scale:

| TABLE M.8.4.1.  PAST PERFORMANCE RELEVANCY RATINGS | |
| --- | --- |
| **Degree** | **Description** |
| VERY RELEVANT (VR) | Past/present performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| RELEVANT (R) | Past/present performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| SOMEWHAT RELEVANT (SR) | Past/present performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| NOT RELEVANT (NR) | Past/present performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

Ex. 1, Conformed RFP, at M20 (GAO AR Tab 87).

171.    The summary "Quality" assessment for each reference borrowed from the

CPARS, which themselves are drawn from the FAR:

| Rating | Definition |
| --- | --- |
| Exceptional | Performance meets contractual requirements and exceeds many to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective. |
| Very Good | Performance meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor were effective. |
| Satisfactory | Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory. |
| Marginal | Performance does not meet some contractual requirements. The contractual performance of the element or sub-element being evaluated reflects a serious problem for which the contractor has not yet identified corrective actions. The contractor's proposed actions appear only marginally effective or were not fully implemented. |
| Unsatisfactory | Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective. |

FAR 42.1503(h)(4).  These ratings are referenced throughout the PPET evaluation reports.  *See, e.g.,* HNFS PPET Report with Individual Contract Reviews (GAO AR Tab 123) at 4.

172.    A final "Confidence" rating would be chosen for each offeror's Factor 2 evaluation based on the cumulative weight of the total references.  Ex. 1, Conformed RFP, at M.8.6 (GAO AR Tab 87).

173.    Importantly, as required by the FAR, the RFP established that the weight each individual past performance reference would be assigned in the cumulative confidence rating process would hinge on how relevant that past performance was, with more relevant work having a larger weighting than less relevant work.  *Id.* at M.8.4.

### *Past Performance Relevancy Evaluation Methodology*

174.    As explained by the RFP's Factor 2 evaluation criteria, "In order to assess the relevancy of the recent (M.8.3) contracts or agreements provided by the Offeror (see L.7.3.), the Government will evaluate the ***scope*** and the ***magnitude*** of effort and ***complexities*** of the work performed under the contracts or agreements as it relates to the requirements for this solicitation."  *Id.* (emphasis added).

175.    Thus, while work encompassing similarities to the T-5 MCS effort under some of these categories, or portions of all three, could achieve partial relevancy credit in the form of a "Somewhat Relevant" rating or even a full "Relevant" rating, to achieve the highest rating of "Very Relevant" the record needed to reflect that the contract reference involved "essentially the same scope and magnitude of effort ***and complexities*** this [T-5] solicitation requires."  *Id.* at M20 (definition of "Very Relevant," emphasis added).  Substantial similarities in one or even two of these categories alone was not enough for a top relevancy rating.

176.     Relevant to this Complaint, the RFP also defined the specific criteria that would be the focus of the "complexity" portion of the Past Performance relevancy analysis by providing a 14-item list of considerations that would gauge whether the identified contract reference was "essentially the same" as T-5 or merely some degree of partial complexity similarity:

| Complexities | The following tasks are to be performed under T-5 requirements: |
|---|---|
| | 1) Establish and maintain provider networks |
| | 2) Maintains a provider directory |
| | 3) Claims processing |
| | 4) Uses value based payment models |
| | 5) Provides management of referrals to specialty care |
| | 6) Provides Medical Management services |
| | 7) Provides Utilization Management services |
| | 8) Provides Case Management services |
| | 9) Uses Predictive Modeling to manage populations |
| | 10) Provides a patient safety program |
| | 11) Provides telehealth services |
| | 12) Customer service |
| | 13) Enrollment functions |
| | 14) Transition functions |

*Id.* at M.8.4.2.  To obtain a "Very Relevant" rating, a contract reference needed to include equivalent requirements for all fourteen requires areas identified here.

### *Past Performance Quality Assessment Methodology*

177.     Per the RFP, the quality of submitted past performance was based on the PPET's assessment of the overall success and failures of the work performed, based on a variety of sources including (but not limited to) "past performance information from other customers known to the Government, Past Performance Information Retrieval System (PPIRS), Contractor Performance Assessment Reporting System (CPARS), Federal Awardee Performance and Integrity Information System (FAPIIS), Electronic Subcontract Reporting System (eSRS), and other sources of useful and relevant information including the Government's own internal records."  *Id.* at M.8.2.

### *The Key Contracts: TriWest's PC3 Contract and HNFS' Incumbent T-2017 Contract*

178.     In the evaluation of Factor 2, both HNFS and TriWest were deemed to warrant a "Satisfactory Confidence" rating.  SSDD (GAO AR Tab 141) at 55.  However, TriWest was found to be a stronger "Satisfactory Confidence" than HNFS.  *Id*. at 55-56.

179.     Both offerors' Factor 2 evaluations were primarily driven by their respective lead past performance references.  In HNFS' case, this was its incumbent T-2017 TRICARE West Region MCS contract work.  In TriWest's case, this was its VA PC3 contract reference.  T-2017 was HNFS' most recent "Very Relevant" experience.  PC3 was TriWest's *only* "Very Relevant"-rated experience for the full scope of the T-5 PWS requirements.[26]

180.     Understandably, HNFS' T-2017 MCS contract was rated "Very Relevant" on the grounds that it is a TRICARE MCS contracts and thus involved essentially the same degree of complexity.  *See id.* at 45.

181.     HNFS' T-2017 Quality score was identified by both the DHA contracting office representative and the PPET as being worthy of a "Very Good" overall performance rating.  *See* HNFS Past Performance Questionnaires (GAO AR Tab 124) at 1-5; HNFS PPET Report with Individual Contract Reviews (GAO AR Tab 123) at 5, 8-10.  However, this rating was downgraded by the SSA to "Satisfactory" Quality.  SSDD (GAO AR Tab 141) at 48-50.

182.     TriWest's PC3 contract was deemed "Very Relevant" and "Very Good" performance quality, thereby giving TriWest a critical comparative edge over HNFS when

---

[26]     Both HNFS and TriWest proposed PGBA, LLC as the dedicated claims processing specialist subcontractor.  Under the terms of the RFP, PGBA, LLC was only evaluated under Factor 2 for the relevancy of its claims processing experience, which was "Very Relevant" since PGBA is HNFS' current claims processing subcontractor.  *See* SSDD (GAO AR Tab 141) at 45, 52.  However, PGBA's experience was not considered "Very Relevant" for the T-5 requirements as a whole, as PGBA's role is exclusively limited to just one segment of the work.

assessing the most important past performance reference submitted by each offeror.  *Id.* at 52.

This materially contributed to TriWest being considered superior to HNFS under Factor 2.

### *The TriWest PC3 "Complexity" Relevancy Assessment*

183.    The SSA concluded that TriWest warranted a "Very Relevant" rating because it

reflected "essentially the same" scope, magnitude, and complexity.  *Id.* at 52-53.  However, the

evaluation record does not support the finding of essential similarity with respect to PC3's

comparative "complexity" to T-5.

184.    The PPET found that TriWest's PC3 contract did not contain similar requirements

for 4 of the 14 complexity criteria identified in the RFP and "close to essentially the same" as T-

5 in 10 of the 14 categories: "[T]he PPET determined the following complexities, as described in

the Offeror's narrative, failed to meet the complexity as described in the Request for proposal:

[1] enrollment, [2] predictive modeling for population health, [3] Telehealth services, and [4]

claims processing."  TriWest PPET Report with Individual Contract Reviews (GAO AR Tab

120) at 16.  It is therefore undisputed that TriWest's PC3 work fails to achieve similarity on

nearly 30% of the complexity requirements.

185.    As to the remaining 10, the PPET found that the PC3 contract are "close to

essentially the same" to the criteria listed in the aforementioned RFP "Table M.8.4.2."  *Id.*

According to the PPET evaluation report, this analysis was based on a conversation with the PC3

contracting officer.  *See id.* at 6 ("This was confirmed on a call with the current VA Contracting

Officer for PCCC (referenced below under the Quality Section in detail), review of the CPARs

and generally available news reports from that time.").  However, the evaluation documentation

fails to meaningfully address two of the remaining 10 complexity criteria in any sort of

meaningful way.

186.     The requirement to demonstrate experience "provid[ing] management of referrals to specialty care" (Ex. 1, Conformed RFP, at M20 (GAO AR Tab 87), Complexity Criterion #5) is simply not mentioned at all in the PPET report or the SSDD as ever having been considered. There is a passing reference to participating in general aspects of basic referral management (TriWest PPET Report with Individual Contract Reviews (GAO AR Tab 120) at 17), but not to the specific, more complex type of referral management of specialty care referrals, which is the specific aspect of referral management deemed to be a critical complexity criterion in the T-5 RFP.  This criterion appears not to have been assessed in the relevancy evaluation of PC3. Moreover, a review of the PC3 PWS confirms that there is no such specialty care referral requirement.  *See* HNFS GAO Protest Ex. 26, PC3 PWS, B.3 § (2)(d)(x)(1).  In fact, the VA, not TriWest, approves all referrals under PC3.  *Id.*

187.     Similarly, the requirement that the PC3 reference reflect analogously complex requirements in the area of providing end-to-end UM services was also not evaluated.  *See* Ex. 1, Conformed RFP, at M20 (GAO AR Tab 87), Complexity Criteria #7).  The UM requirements mandated by the T-5 PWS include a full UM program with multiple components:

> **C.2.6.** Utilization Management (UM)
>
> **C.2.6.1.** The Contractor shall develop, implement, and maintain a UM Program in accordance with the TOM Chapter 7, Section 4.
>
> **C.2.6.2.** The Contractor shall apply its UM practices for all TRICARE eligible beneficiaries receiving care in the private sector care system and in a manner consistent with the TOM Chapter 7, Section 4.
>
> **C.2.6.3.** ***The Contractor shall ensure that care provided is reviewed for medical necessity*** (if applicable), is appropriately authorized, and complies with the TRICARE benefits contained in 32 CFR 199.4 and 199.5, and the TPM.

*Id.* at C9 (emphasis added).  Of note, utilization "reviews" are just one component of the fully scoped UM program, which is heavily geared toward meeting the onerous and complex TRICARE Operations Manual requirements.

188.    However, the TriWest PC3 relevancy evaluation only mentions that TriWest performs "Utilization Reviews," not that it manages a full-scale UM program as required by T-5.  *See* TriWest PPET Report with Individual Contract Reviews (GAO AR Tab 120) at 17.  There is not evaluation of the "Utilization Management Services" complexity criteria as required by the T-5 evaluation criteria.  TriWest does not provide a full UM program under PC3.

189.    Having conceded that PC3 does not meet 4 of 14 T-5 complexity criterion, and having failed to address two more, it is already readily apparent that PC3 failed to meet 6 of 14 (43%) complexity criterion, which should have precluded a finding that PC3 reflected "essentially the same" degree of complexity necessary to justify the "Very Relevant" rating it received.  However, there were yet two more complexity criterion that PC3 also does not meet, despite the evaluators' cursory claims to the contrary.

190.    The very first Complexity Criterion in the T-5 RFP list is "establish and maintain provider networks."  Ex. 1, Conformed RFP, at M20 (GAO AR Tab 87).  While PC3 requires TriWest to maintain a substantial provider network, the complexity of the required PC3 network pales in comparison to that of the TRICARE MCS network.  There are many reasons for this, but two are most overt.  First, with extremely narrow exceptions that do not affect the analysis here, PC3's provider network services veterans only, and thus the provider network tailored for PC3 is a network that services a narrow population, while the TRICARE MCS program services the entire family of each enrolled member of the DoD community.  The full suite of pediatric support critical to the TRICARE MCS provider network is simply not a part of PC3.  Second, the

PC3 contractor is not required—and does not—negotiate network provider discounts, which is arguably the single most complex aspect of establishing the TRICARE MCS network as a new, incoming contractor.  In short, the PC3 network services a much narrower population and engages providers in a much more simplified way than is required under T-5.  Network size alone does not justify DHA ignoring the vast differences in requirements complexity during an analysis of past performance relevancy in the area of requirements "complexity."

191.    Similarly, TriWest was given full complexity credit for the "maintain a provider directory" complexity criterion, despite the glaring differences between the PC3 and T-5 requirements regarding a "provider directory."  The T-5 network provider directory requirement contains two distinct requirements to maintain an agency-facing and beneficiary-facing provider directory that each encompass over a dozen distinct directory informational criteria.  *See* Ex. 1, Conformed RFP, at C5 to C6 (§§ C.2.1.13.1, C.2.1.13.2) (GAO AR Tab 87).  Beyond basic identifying information like name and contact information, the TRICARE network provider directory must contain a wide array of information about each provider's primary care managers, telehealth services, TRICARE Provider Readiness Designation, quality indicators, website information, Health Information Service Provider (HISP) address, Health Information Exchange participation.  TRICARE Contractors are also required to demonstrate a month-to-month accuracy level that is closely monitored by DHA and results in contract penalties when not met.  *Id*.  If even a single piece of required information is missing on either the DHA or beneficiary version of the directory, the entire directory entry is considered invalid.

192.    The PC3 contract contains no "provider directory" requirement.  It merely contains a requirement to maintain a basic "provider list" and supply it to just the VA—not beneficiaries.  *See* HNFS GAO Protest Ex. 26, PC3 PWS at 37 (§ B.3(2)(d)(vii)(2)).  The PC3

"provider list" requirement states that "[t]he Contractor shall maintain and provide a list of network providers/clinicians providing health care services under this contract" and that the list must include "name, address, phone number, specialty and sub-specialties, languages spoken, [and] hospital affiliation(s)." *Id.* There are no requirements for maintaining more complex directory data such as primary care managers, telehealth services, TRICARE Provider Readiness Designation, quality indicators, website information, Health Information Service Provider (HISP) address, Health Information Exchange participation, amongst other things. And, there is no month-to-month assessment of accuracy in the manner applicable to TRICARE. Yet, the PPET awarded TriWest's PC3 contract with full relevancy credit for a provider directory requirement that was essentially the same complexity. TriWest PPET Report with Individual Contract Reviews (GAO AR Tab 120) at 17.

193.    In total, TriWest's PC3 work lacks comparable complexity in 8 of 14 requirements areas required to be assessed under the T-5 evaluation Past Performance relevancy criteria (57%). Ex. 1, Conformed RFP, at M20 to M21 (GAO AR Tab 87).

### *The Quality Assessments of PC3 and T-2017*

194.    The performance history of TriWest's PC3 contract and HNFS' T-2017 contract reflect significant parallels. As reflected in the CPARs and narrative evaluation summaries, both firms began with performance problems and then both dramatically improved performance over time and achieved consistently strong performance ratings for the vast majority of the evaluated performance period. *See* SSDD (GAO AR Tab 141) at 46-47 (HNFS T-2017), 52-54 (TriWest PC3).

195.    In the final evaluation, the SSA determined that this performance track record warranted TriWest a summary "Quality" rating of "Very Good." *Id.* at 53. Three positive

factors were identified to explain why three full years' worth of "Marginal" performance were

sufficiently overcome to warrant an aggregate rating of "Very Good" for overall PC3

performance quality:

> First, there is clear evidence in the record that TW made
> continuous improvement in contract performance throughout the
> life of the contract and for the past three years has continuously
> sustained "Very Good" to "Exceptional" performance. . . .
>
> Second, [redacted] personnel acknowledge, over multiple CPARS
> reports, that there were many significant, and often unanticipated,
> Government driven changes to the program requirements, some
> legislative, which changed the scope of requirements on short
> notice during performance[.] . .
>
> [Third[27]] and perhaps most convincing, are the comments from
> multiple [redacted], over time, in the record, that continuously
> highlight the work, cooperation and dedication of TW.

*Id.* at 53-54.

196.    Meanwhile, HNFS was only rated "Satisfactory" for its T-2017 performance,

despite each of the same three criteria discussed above being equally or more applicable to its

T-2017 performance as they were to TriWest's PC3 work.

197.    While TriWest was credited for "continuous improvement in contract

performance throughout the life of the contract and for the past three years has continuously

sustained 'Very Good' to 'Exceptional' performance," *id.*, HNFS also improved initial

Marginally rated performance in Transition and the first year of its contract performance (Option

---

[27]    The SSA states that he has identified "four" reasons for diminishing TriWest's three-
years of marginal performance.  SSDD (GAO AR Tab 141) at 53 ("[T]here are four things that
combine to cause me to determine TW's performance quality to be Very Good.").  However, in
the subsequent discussion of his reasoning, he includes only three rationales, labeled "First,"
"Second," and "Fourth."  It appears the rationale that had been designated his "third" reason in
support of the "Very Good" rating was edited-out during the SSDD revision process, yet the
numbering was inadvertently not updated.

Period 1) to fully achieve Satisfactory or better performance by Option Period (OP) 2, and then achieve three consecutive years of "'Very Good' to 'Exceptional' performance."



*See* HNFS OP2 – OP4 CPARs (GAO AR Tab 125) at 28, 37, 45; *see also* HNFS GAO Protest Ex. 35, HNFS T-2017 OP5 CPAR at 2.  This is the exact same type of improvement for which TriWest was credited under PC3, after HNFS sustained fewer years of less successful performance under T-2017 than TriWest did under PC3.  In the end, the present-day Past Performance Questionnaire (PPQ) by the T-2017 and PC3 contracting officers ranked each firm's overall performance as "Very Good."  *See* HNFS Past Performance Questionnaires (GAO AR Tab 124) at 5; TriWest - Past Performance Questionnaires (GAO AR Tab 121) at 5.

198.    Second, HNFS, like TriWest under PC3, encountered a major requirement overhaul almost immediately upon commencing T-2017 transition in the form of the congressionally mandated implementation of the TRICARE Select program.  Through this program, Congress imposed massive wholesale changes to the structure of the T-2017 contract performance requirements via the 2017 National Defense Authorization Act's ("NDAA") imposition of the TRICARE Select program. Pub. L. 114-328, Title VII, Sec. 701(a)(1).  In the words of the late Senator John McCain, this change represented "the most sweeping overhaul of the military health system in a generation." 162 Cong. Rec. 53394-97 (June 6, 2016) (Statement

of Sen. McCain).  This cardinal change to the T-2017 contract eventually resulted in significant alterations to the way contractors performed the TRICARE MCS work, as well as the way the contractors were paid under the contract because the degree of difficulty in achieving contract requirements had greatly increased.[28]

199.    Making matters worse, at the same time HNFS was enduring the challenge posed by the TRICARE Select changes to the T-2017 contract performance model, substantial mismanagement by DHA of the transition from the expiring T-3 MCS West Region contract held by UnitedHealth to HNFS' new T-2017 West Region contract greatly exacerbated HNFS' early performance challenge.  This contract mismanagement is outline in detail in a scathing 2019 GAO report, the substance of which is summarized in the following way in the report "Overview":

> ***DOD experienced challenges during the T-2017 transition that resulted from weaknesses with its transition guidance and oversight***.  Specifically, DOD's guidance does not always specify

---

[28]    Traditionally (and as reflected in the T-3 MCS contracts and the initially awarded T-2017 contracts), TRICARE had required a civilian provider network concentrated around MTFs, following an HMO model.  Under this type of model, which existed in all prior TRICARE MCS generations, the TRICARE MCS contractor exercised a high degree of control over beneficiary options and also controlled costs by obtaining discounted services from network providers.  In contrast, the new TRICARE Select program requirements imposed by Congress after award of the T-2017 contracts emphasized beneficiary choice and wide access to health-care providers—specifically, "a self-managed, preferred-provider [PPO] network option," "in all areas."  Pub. L. 114-328, Title VII, Sec. 701(a)(1).  The NDAA provided that "[u]nder TRICARE Select, eligible beneficiaries will not have restrictions on the freedom of choice of the beneficiary with respect to health care providers."  *Id.* at Sec. 701(a)(2).  Indeed, the NDAA emphasized that the Secretary of Defense would develop "an implementation plan to improve access to health care for TRICARE beneficiaries pursuant to the [NDAA] amendments," and "ensure access standards for appointments for health care that meet or exceed those of high-performing health care systems in the United States."  *Id.* at Sec. 701(f)(1)-(2).  Accordingly, the entire TRICARE civilian network model had to change—on the fly—from a network focused on discounted providers, to a broader, deeper, provider network focused on beneficiary choice, access, and satisfaction.  It fell to the T-2017 contractors to implement this major contract change with little lead time, while also dealing with all the other transition-related challenges occurring during early performance of T-2017.

the amount and types of data outgoing contractors have to share with incoming contractors. This led to contractor disagreements over data transfers, which DOD did not always resolve in a timely manner. Contractors reported that these issues contributed to problems after health care delivery began for the T-2017 contracts, such as with processing referrals. ***DHA also determined that some of DHA's oversight requirements, such as for specialty care referrals, were not feasible or effective***, which limited some testing of contractors' readiness for health care delivery. ***This occurred in part because DOD's relevant subject matter experts did not review the requirements***.

DOD addressed most of the problems that occurred after health care delivery began by requiring the contractors to develop and implement corrective action plans. DOD and contractors are addressing some problems that have persisted, including problems with the contractors' provider directory accuracy in both regions and claims processing in one region. ***DOD has an opportunity to avoid similar problems in the future by improving the specificity of its transition guidance and effectiveness of its oversight requirements***.

GAO Publication No. 20-39, *Defense Health Care: Opportunities to Improve Future TRICARE Managed Care Support Contract Transitions* at 2 (emphasis added).[29]

200. Third, the SSA highlights the extensive and consistent number of highly positive comments received in TriWest's PC3 CPARS and other evaluative comments in more recent years since early performance challenges. SSDD (GAO AR Tab 141) at 54. However, HNFS' T-2017 record reflects the same. Just a few such examples include:

- "***HNFS was dedicated and implemented multiple activities to improve health outcomes for beneficiaries during this PoP.*** ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████ HNFS OP2 – OP4 CPARs (GAO AR Tab 125) at 29-30 (emphasis added).

---

[29] *Available at* https://www.gao.gov/assets/gao-20-39.pdf.

- "HNFS *exceeded* its overall Small Business (SB) subcontracting goal and all individual small business concern goals required in the SB subcontracting plan . . . ." *Id.* (emphasis added).

- "***Despite multiple Government (DMDC) system outages and the implementation of a new DOES system, HNFS met 100% of enrollment standards*** during the entirety of the PoP.  ***The HNFS enrollment staff were available, prepared and proactive with improvements***." *Id.* (emphasis added).

- "***HNFS engaged in numerous standing meetings with the government and proactively contributed to improvements in interactions and responsiveness***."  *Id.* at 24 (emphasis added).

- "***HNFS initiated several*** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇*, which resulted in significant improvements in* ▇▇▇▇▇▇▇▇▇▇▇▇."  *Id.* at 26 (emphasis added).

- "In response to change orders, milestone, delivery schedules and administrative requirements, HNFS was appropriate but their ***timeliness, responsiveness and communication significantly improved*** during the second half of the PoP.

▇▇▇▇▇▇."  *Id.* at 27 (emphasis added).

- "HNFS demonstrated ***continued improvement in cost controls*** and focused specifically on areas of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."  *Id.* at 27-28 (emphasis added).

- "***HNFS's*** ▇▇▇▇▇▇▇▇▇ ***was exceedingly accessible, efficient, professional and willing to accept recommendations from the Government during this period. HNFS was responsive in addressing all possible areas of concern, timely and expeditiously***."  *Id*. at 35 (emphasis added).

- "***HNFS met, or exceeded all contract requirements for Customer Service response and timeliness.  HNFS performance was notable given the Government-caused challenges with Defense Manpower Data Center (DMDC) access***. ▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████████████████████████████

*Id.* at 36 (emphasis added).

- "***HNFS demonstrated continued improvement in cost controls*** and focused specifically on ████████████████████████████████████████████████████████

  ███████████████████████████████ *Id.* at 38 (emphasis added).

- "***HNFS maintained an excellent and collaborative relationship with the Government***. HNFS engaged in numerous standing meetings with the Government, and ***proactively contributed to improvements in interactions and responsiveness. HNFS rapidly scaled up corporate response to the COVID-19*** Global Pandemic, and provided accurate, timely and focused responses to all Government requirements related to this unprecedented global health emergency.  COVID-19 data and support provided by ***HNFS positively and significantly impacted DHAs ability to respond to the pandemic within the MHS and beyond***."  *Id.* (emphasis added).

201.    Yet, despite equal record of improvement in the last three years, even greater government-imposed challenges on early T-2017 performance, and an equivalent amount of glowing comments on performance improvement and extra effort to exceed requirements, HNFS was rated "Satisfactory" for T-2017 performance quality, overruling the recommendation in the DHA recommendation in the PPQ and the recommendation of the PPET.  SSDD (GAO AR Tab 141) at 46-47; HNFS PPET Report with Individual Contract Reviews (GAO AR Tab 123) at 4.

## V.    CAUSES OF ACTION

### COUNT I

**TRIWEST MATERIALLY MISREPRESENTED THE TOTAL ESTIMATED VALUE OF ITS PLANNED T-5 SUBCONTRACTING SPENDING AND SUBCONTRACTING COMMITMENTS; TRIWEST MUST BE DISQUALIFIED FROM THE PROCUREMENT**

202.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

203.    "[A]n offeror has an obligation to submit a proposal that is, to the greatest extent possible, an accurate one."  *NetCentrics Corp. v. United States*, 145 Fed. Cl. 158, 169 (2019). The Court will find that an offeror has made a material misrepresentation where (1) the awardee

████████████████████████████████████████

made a false statement; and (2) the agency relied upon that false statement in selecting the awardee's proposal for the contract award.  *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

204.   In submitting both initial and revised Factor 4 proposal volumes that included materially inaccurate subcontracting spending calculations and commitments, TriWest made material misrepresentations and failed to adhere to its obligation to submit an accurate proposal.

205.   Specifically, TriWest materially misrepresented its subcontracting spending calculations and commitments, premising its proposal and subcontracting calculations on exclusions that were plainly impermissible, resulting in TriWest unlawfully excluding ███ ███ in subcontracting spending from its proposal.  *See* ¶¶ 55-107, *supra*.  Even DHA recognized that TriWest deliberately and impermissibly carved out several categories of subcontracting dollars that "***clearly reflected subcontracting dollars necessary for the small business subcontracting evaluation***."  TriWest – Response to Contractor Responsibility Determination Questions (GAO AR Tab 162) at 3 (emphasis added).

206.   TriWest's initial small business subcontracting plan stated that there was only ███████ in "Subcontract Opportunities."  TriWest – FPR – Volume I (GAO AR Tab 102) at 46-47.  TriWest also stated that "the principal products and/or services to be subcontracted under this contract" included ████████████████—which is TriWest's subcontract with ████.  *Id.* at 49.  TriWest did not state that it excluded all or any of the ██ ███ subcontract to ████, nor did it identify the dollar amounts for any category of its ██ ███ total in outright exclusions from its identified "Subcontract Opportunities."  *Id.* at 46-47; TriWest – Response to EN 01 (GAO AR Tab 146) at 7.  TriWest's statement that there was only

██████ available for subcontracting was false.  TriWest's statement that its work "to be subcontracted" included ██████████ was false.

207.   TriWest's statement that █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ was also false.  TriWest – FPR – Volume I (GAO AR Tab 102) at 53.  Since at least ████, TriWest has not even considered a significant portion of its subcontracting opportunities as available for potential small and disadvantaged businesses. TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 12; TriWest – Response to Contractor Responsibility Determination Questions (GAO AR Tab 162) at 3.

208.   TriWest then introduced further misrepresentations in its revised proposal, including the improper exclusion of "Employee Costs," "Network Subcontractors," and numerous other-than-small subcontractors including ███████████████████ ████████████████████████████████████████████████████ ██████.  *See* ¶¶ 92-97, *supra*.

209.   DHA relied upon those calculations and commitments in awarding the contract to TriWest.  *See* TriWest Small Business Evaluation with Attachment (GAO AR Tab 118) at 2; SSDD Addendum (GAO AR Tab 158) at 2.

210.   Consequently, both elements of material misrepresentation ("(1) a false statement; and (2) agency reliance on the false statement to favorably evaluate the proposal") are present, and TriWest must be disqualified from the procurement.  *See NetCentrics Corp*, 145 Fed. Cl. at 169 (citing *Bannum, Inc. v. United States*, 119 Fed. Cl. 291, 307 (2014); *GTA Containers, Inc. v.*

*United States*, 103 Fed. Cl. 471, 483 (2012); *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006)).

211.    Material misrepresentations in Government procurements of any size (let alone a $65.1 billion competition) are serious matters that come with serious consequences.  Here, TriWest's misrepresentations impact the acceptability of its proposal, the consideration of the availability of ████ of taxpayer dollars for small business participation, and its responsibility determination.

212.    Even if not intentional, TriWest's material misrepresentations warrant exclusion. *NetCentrics Corp.*, 145 Fed. Cl. at 169 (A material misstatement made with the intent to deceive is particularly egregious, but that "does not mean that an agency lacks the discretion to disqualify a proposal that contains a material misrepresentation that an offeror included inadvertently (as opposed to intentionally) in its proposal.")

213.    In light of TriWest's repeated false statements and TriWest's material omission of ████ of dollars in required subcontracting spending, DHA was required, but failed, to eliminate TriWest from this competition as soon as the material misrepresentation was made apparent.

## COUNT II

### TRIWEST MATERIALLY MISREPRESENTED ITS HISTORICAL COMPLIANCE WITH FAR 52.219-8 AND FAR 52.219-9; TRIWEST MUST BE DISQUALIFIED FROM THE PROCUREMENT

214.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

215.    TriWest also materially misrepresented its historical compliance with FAR 52.219-8 and FAR 52.219-9 in connection with its past performance references.

**REDACTED VERSION**

216.    The Solicitation required offerors to "submit a record of . . . compliance with FAR 52.219-8 Utilization of Small Business Concerns and 52.219-9, Small Business Subcontracting Plan including past eSRS, if applicable, and all correspondence with the cognizant CO or Small Business Specialist regarding its compliance for the past three (3) years on current or past Government contracts."  Ex. 1, Conformed RFP, at L31 (GAO AR Tab 87).

217.    During this procurement, TriWest informed DHA that TriWest had been relying on an improper subcontract exclusion since as early as ███.  TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 12; TriWest – Response to Contractor Responsibility Determination Questions (GAO AR Tab 162) at 3.  TriWest also confirmed that it would be █████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████.  TriWest – FPR – Volume II (GAO AR Tab 103) at 11; TriWest – FPR – Volume III (GAO AR Tab 104) at 6. And the subcontracting reports for TriWest's past performance references also ██████████ ████████████████████████████████████ ██████████████.  *See* TriWest – FPR – Volume III (GAO AR Tab 104) at 72-83.

218.    Therefore, TriWest's own statements in this procurement demonstrate that its ██████████████████████████████████████████ ███████████████████████████.

219.    ██████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████

220.    All facts before DHA indicated that TriWest's past performance references likely included the same material misrepresentations that TriWest included in its initial proposal for T-5 (the improper exclusion of ███████████ of dollars in required subcontracting costs).

221.    Despite this, DHA awarded the contract to TriWest, finding that, "[o]verall, the PPET assessed the Offeror to have satisfactory performance in meeting small business subcontracting goals."  TriWest PPET Report with Individual Contract Reviews (GAO AR Tab 120) at 11; *see also* SSDD Addendum (GAO AR Tab 158) at 2.

222.    As TriWest admitted to relying on erroneous exclusions of other-than-small business subcontracting dollars from its subcontracting denominators for ████████ ███████████████████████████████████████████, TriWest materially misrepresented far stronger small business participation than its performance under the proper measurements would garner.

223.    In other words, had TriWest not relied on impermissible exclusions to its subcontracting base, it would not have received the small business participation percentages and scores that it was awarded, as those percentages and scores were premised on faulty calculations that artificially increased TriWest's percentage spend to small businesses.

224.    These material misrepresentations warrant TriWest's elimination from the procurement and raise ████████ worth of concerns related to submission of false small business individual and summary subcontract reports.  *See NetCentrics Corp.*, 145 Fed. Cl. at 174.

## COUNT III

### TRIWEST'S REVISIONS TO ITS FACTOR 4 SUBMISSION INTRODUCED FUNDAMENTAL INCONSISTENCIES THAT DHA ARBITRARILY AND CAPRICIOUSLY FAILED TO CONSIDER

225.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

226.    The Court reviews agency evaluations under the "arbitrary and capricious" standard prescribed by the Administrative Procedure Act.  While this standard is deferential, the Court will set aside an evaluation where "the agency entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency . . . ." *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014) (quoting *Ala. Aircraft Indus., Inc.–Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed. Cir. 2009)) (alterations in original).

227.    TriWest's corrective action communications and proposal revisions introduced fundamental and irreconcilable proposal inconsistencies at the most basic level.  In awarding the contract to TriWest and finding TriWest's Factor 4 submission "Acceptable," DHA entirely failed to consider fundamental inconsistencies in TriWest's proposal.

228.    Prior to corrective action, TriWest's technical approach was centered on impressing DHA with TriWest's purportedly larger network of providers, as well as the volume and size of TriWest's other-than-small network subcontractors.  *See* TriWest – FPR – Volume II (GAO AR Tab 103) at 7, 11-13, 15-17.  Further, TriWest initially relied on an overarching 25% small business subcontracting goal applied against its paltry ███████ subcontracting base, meaning that its original plan identified ██████████ (75%) in identified large business

subcontracting, including large businesses in each of the above product/service areas.  TriWest –

FPR – Volume I (GAO AR Tab 102) at 46.

229.    TriWest also identified that it would be relying on unspecified other-than-small

businesses across all categories of identified supplies and services to be subcontracted:



*Id.* at 49 (highlighting added).

230.    However, during corrective action, TriWest conceded that it was required to add

back in ██████ in previously excluded other-than-small business subcontracts for "non-

biddable costs" and ██████ in other than small business subcontracts for "non-affiliated

network subcontractors."  TriWest - Response to EN 01 (GAO AR Tab 146) at 7; TriWest –

Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 10, 12.

231.    With these additions, TriWest's other than small business planned subcontracting

is ██████████████████

232.     Once TriWest's initial other-than-small business subcontracting spend is added to TriWest's "non-biddable costs" and "non-affiliated network subcontractor" figures, TriWest's actual other-than-small business subcontracting spend leaves only ███████████ or a mere ████ of TriWest's entire subcontracting base for small businesses, far short of the Solicitation's 25% identified goal:

| | |
|---|---|
| TriWest Revised Subcontracting Denominator:[30] | ████████████ |
| TriWest Total Other-than-Small Subcontracting Spend:[31] | ████████████ |
| *Subcontracting Dollars Available for Small Businesses:*[32] | ████████████ |

233.     Despite these changes, **TriWest maintains a 25% small business subcontracting goal in its revised plan**.  Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150).  TriWest's math simply does not add up.  To achieve a 25% goal against its significantly increased base, TriWest would have to eliminate or reduce its payments to the very other-than-small businesses that it relied on elsewhere in its proposal to garner its high technical ratings.

234.     And, this is exactly what it appears TriWest has done.  The revised table of Subcontracted Principal Products and Services in TriWest's revised small business

---

[30]     This number is taken directly from TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 14.

[31]     This number is based on a calculation of TriWest's initial other-than-small business spend (███████████), plus TriWest's "non-biddable costs" (███████████), and TriWest's "non-affiliated network subcontractor" spend (███████████).  The initial spend is documented in TriWest – FPR – Volume I (GAO AR Tab 102) at 46, and the "non-biddable costs" and "non-affiliated network subcontractor" figures are located in TriWest – Response to EN 01 (GAO AR Tab 146) at 7.

[32]     Calculated as TriWest's revised subcontracting denominator (as it appears in TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 14) minus TriWest's total other-than-small business spend.

subcontracting plan reveals these now omitted other-than-large businesses from most of its

subcontracting categories:



TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab

150) at 18 (highlighting added).

235.    This fundamental shift away from TriWest's core other-than-small business

teaming partners is all the more apparent in TriWest's corrective action responsibility

communications.   In its most recent subcontractor identification, not a single one of TriWest's

network subcontractors continues to be proposed to perform subcontracts valued at ███ or

more over the life of the contract.  TriWest – Response to Contractor Responsibility

Determination Questions (GAO AR Tab 162) at 2-3.  And a mere █ other-than-small businesses

are even identified as performing subcontracts valued at ███ or more over the life of the

contract.  *Id.*

236.    TriWest's dramatic shift in its subcontracting approach materially affected its team composition and technical approach, and TriWest's technical approach cannot be squared with its revised Factor 4 submission.

237.    DHA did not permit TriWest to revise its price or technical proposals as part of corrective action, yet TriWest purportedly added over ███████ dollars in subcontracting spend and over ██ new small business subcontractors.  This created fundamental internal inconsistencies in TriWest's proposal, which DHA arbitrarily and capriciously failed to consider. *See Lab. Corp. of America*, 116 Fed. Cl. at 650.

## COUNT IV

## DHA ARBITRARILY AND CAPRICIOUSLY ACCEPTED TRIWEST'S REVISED SUBCONTRACTING GOALS, WHICH WERE BASED UPON TRIWEST'S HISTORICAL PERFORMANCE AGAINST IMPROPERLY CALCULATED AND REPORTED SMALL BUSINESS PARTICIPATION

238.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

239.    During corrective action, TriWest admitted to DHA that it has been erroneously calculating its achievement against its small business goals (and reporting against them) for at least ███████.  TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 12; TriWest – Response to Contractor Responsibility Determination Questions (GAO AR Tab 162) at 3.

240.    In its revised small business subcontracting plan, TriWest's identified "method used to develop subcontracting goals" at its own "historical experience in similar lines of business."  TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 12.

REDACTED VERSION

241.    But, as TriWest conceded that its historical experience and prior exclusions were erroneous, it was improper for DHA to accept TriWest's identified goals and Factor 4 proposal.

242.    Specifically, on two separate occasions TriWest conceded that it has been improperly excluding network subcontractor costs from the denominator of its small business subcontracting calculation since



TriWest – Response to Contractor Responsibility Determination Questions (GAO AR Tab 162) at 3 (emphasis added).

243.    TriWest's statements indicate that TriWest has been relying on these unlawful exclusions for not only the T-5 West procurement, but also for TriWest's subcontracting approach over the past ████—*i.e.*, TriWest's historical experience.

244.    Nevertheless, and despite finding TriWest's historical exclusions clearly improper, DHA failed to conduct any sort of reasonable analysis regarding the full scope of TriWest's reliance on these impermissible exclusions and TriWest's "historical experience."

245.    Instead, DHA unreasonably determined that TriWest's method "clearly" meets the RFP's minimum requirements.  SSDD Addendum (GAO AR Tab 158); SSAC Report Addendum (GAO AR Tab 159); TriWest – Revised Small Business Evaluation as Part of Corrective Action (GAO AR Tab 160).

246.    This conclusion was not only baseless and contradicted by TriWest's proposal, it was also demonstrably irrational.  DHA accepted a method to develop subcontracting goals that was dependent upon admitted historical inaccuracies and clearly inaccurate subcontracting exclusions, which TriWest attempted to rely on for this procurement.  *See Lab. Corp. of America*, 116 Fed. Cl. at 650.

## COUNT V

### DHA'S EVALUATION OF TRIWEST'S PROPOSAL UNDER FACTOR 4, SMALL BUSINESS PARTICIPATION, WAS ARBITRARY AND CAPRICIOUS

247.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

248.    "It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation." *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 271 (2021).  "[A]n agency contracting officer has three choices when a proposal does not meet a solicitation's mandatory requirements: '(1) amend the solicitation in accordance with FAR

15.206(d), (2) negotiate with the offeror to get it to meet the requirements, or (3) reject the proposal.'" *Id.*

249.    TriWest's proposal failed to clearly meet the Solicitation's Factor 4 requirements in at least four separate instances: (1) failure to include an accurate calculation of subcontracting spend; (2) failure to identify small businesses in the proposal; (3) failure to include meaningful participation of small businesses; and (4) failure to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable.

250.    Critically, each of these four material flaws independently renders TriWest ineligible for award.  *See* Ex. 1, Conformed RFP, at M23 (GAO AR Tab 87).

251.    DHA was therefore required to find TriWest ineligible for award.  The fact that DHA found TriWest's proposal "Acceptable" was arbitrary and capricious.

252.    First, TriWest's proposal failed to include an accurate calculation of subcontracting spend as required by the Solicitation and FAR 19.704(a)(2).  *See* Ex. 1, Conformed RFP, at L12 (GAO AR Tab 87); FAR 19.704(a)(2) (requiring TriWest to submit "a statement of the total dollars planned to be subcontracted and a statement of the total dollars planned to be subcontracted to small business.").

253.    As explained above, TriWest initially stated that its entire subcontracting base (*i.e.*, the total dollars planned to be subcontracted) for its $65 billion proposal was a paltry ██████████.  TriWest – FPR – Volume I (GAO AR Tab 102) at 46.  This number included ██████████████ (75%) in identified subcontracting to other-than-small businesses across all categories of TriWest's principal products and services.  *See id.* at 46, 49.  After TriWest added ████████████ in previously excluded other-than-small business subcontracting spend (which TriWest impermissibly attributed to "non-biddable costs") and an additional ███████████ in

**REDACTED VERSION**

other-than-small business subcontracting (which TriWest impermissibly attributed to "non-affiliated network subcontractors") to the calculation, TriWest's other-than-small subcontracting base necessarily must be at least ███████████████████████████████ ████████████. *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 7; TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 10, 12. Considering that ██████████ figure in conjunction with TriWest's revised "Total Subcontracted Dollars" calculation of ██████████, TriWest can only subcontract a maximum of ██████████ to small businesses, which represents just ████ of TriWest's total subcontracting spend, grossly short of the 25% small business spend TriWest claims in its proposal and that DHA relied upon in the evaluation. *See* TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 17.

254.    Second, TriWest failed to identify small businesses in its proposal as required by the Solicitation. *See* Ex. 1, Conformed RFP, at M23 (GAO AR Tab 87).

255.    TriWest's original Factor 4 proposal identified a total of ████ small businesses— ████████████████████. *See* TriWest – FPR – Volume I (GAO AR Tab 102) at 53; *see also* TriWest – Response to EN 01 (GAO AR Tab 146) (DHA noting that TriWest identified only ████ businesses in its plan).

256.    Despite not revising any aspects of its proposal aside from its Factor 4 submission due to the limited nature of corrective action, TriWest purports to have identified a list of ██ small-business subcontractors. *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 9-10; TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 22-23; TriWest – Response to Determination of Responsibility Follow-Up (GAO AR Tab 165) at 3-8.

257.    Providing names on paper is not equivalent to identifying businesses for purposes of small business subcontracting.  There is no indication that these entities will be involved in performance and nothing demonstrating that any meaningful subcontracting spend (let alone 25% of TriWest's entire subcontracting base) will be going to the entities.

258.    TriWest did not explain what changed between its initial and FPR with respect to TriWest's team composition and task performance.  *See* TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150).  TriWest did not offer any explanation as to how it was purportedly shifting ███████████ dollars in other-than-small business spend to small businesses without making a single change to its technical approach.  *See id.*

259.    DHA cannot reasonably determine that TriWest's proposal "clearly meets the minimum requirements of the solicitation"—including identification of small businesses—where there is no evidence that those small businesses are included in any aspect of the proposal aside from a single list included in TriWest's 11th hour revisions to it small-business plan.

260.    TriWest similarly failed to identify other-than-small businesses in the plan despite the Solicitation requirement and DHA's directive to "provide a list of all anticipated subcontractors (both small and other than small businesses) as well as what function they will perform."  TriWest – Response to EN 01 (GAO AR Tab 146) at 11.  As explained above, while TriWest provided DHA with a table purportedly listing all of the other-than-small businesses, that table omitted at least █ other-than-small businesses identified in TriWest's proposal or in its post-award press releases.  *See* TriWest – FPR – Volume II (GAO AR Tab 103) at 16, 26, 52; TriWest – Subfactor 4 – Final Technical Evaluation_M.7.2.4 (GAO AR Tab 129) at 23.  Those businesses include companies such as ████████████████████

261.    And TriWest also failed to list any of its ███ network subcontractors despite identifying them as subcontractors in its proposal in the instances where TriWest wanted to take credit for their networks.  *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 11-12; *id.* at 9 ("TriWest intends to subcontract with independent BCBS entities to execute T-5 contract obligations"); TriWest – FPR – Volume II (GAO AR Tab 103) at 5 (identifying BCBS entities as subcontractors).

262.    Third, TriWest failed to demonstrate participation (let alone meaningful participation) of small businesses as required by the Solicitation.  Ex. 1, Conformed RFP, at M23 (GAO AR Tab 87).

263.    Nowhere in it is initial Factor 4 submission did TriWest state that small businesses would perform meaningful work or even any of the Statement of Work areas identified in Section C.  *See* TriWest – FPR – Volume I (GAO AR Tab 102) at 46-63.  During corrective action, TriWest did not revise any aspects of its proposal aside from its Factor 4 submission to identify or allocate work scope for small businesses, yet it purportedly added over ███ dollars in subcontracting spend and over ███ new small business subcontractors.

264.    But, as the record demonstrates, at least ███ of the revised subcontracting plan dollars are going directly to other-than-small businesses that TriWest impermissibly excluded from consideration in its initial proposal.  *See* TriWest – Response to EN 01 (GAO AR Tab 146) at 7; TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150) at 10, 12.

265.    TriWest cannot add over ▮ new small businesses to its proposal without greatly increasing its total subcontracted dollars to account for the new small-business spend and taking away work that had been allocated to other-than-small businesses in the other portions of its proposal.

266.    Without TriWest revising its proposal to account for performance and spend for any new small business subcontractors, there is no reasonable basis for DHA to conclude that the identified businesses (or small business subcontractors in general) will be meaningfully participating in performance.

267.    Fourth, TriWest failed to demonstrate good faith efforts or plans to meet the Solicitation's subcontracting goals to the maximum extent practicable.  Even under a deferential standard of review, there is no basis upon which DHA could reasonably determine that TriWest's revised Factor 4 proposal "*clearly meets* the minimum requirements of the solicitation."

268.    Nothing in TriWest's proposal or its performance to date suggests that TriWest is undertaking good faith efforts or maximizing small business spend.  At every step of the way, TriWest has taken steps to carve out dollars from its overall subcontracting spend and reduce its reliance on small business subcontracting to maintain its existing or convenient other-than-small business relationships.  *See* TriWest – Response to EN 01 (GAO AR Tab 146); TriWest – Response to EN 02 & Submission of Revised Small Business Plan (GAO AR Tab 150).

269.    TriWest's performance approach (as reflected in its other proposal volumes) does not appear to account for any of the small business subcontractors TriWest identified in its revised Factor 4 submission, and TriWest's past practices illustrate that it has failed to accurately represent small business subcontracting spend for at least the past ▮▮▮▮  *See id.*  Far from

subcontracting to the "maximum extent practicable," TriWest is doing everything it can to avoid including costs in its small business subcontracting calculations. This is the antithesis of "good faith."

270. Because Factor 4 was a threshold eligibility requirement, and because DHA could find a proposal "Acceptable" only where the proposal "clearly meets" the Solicitation's Factor 4 requirements, DHA's Factor 4 evaluation was arbitrary and capricious.

271. Even under a deferential standard of review, there is no basis upon which DHA could reasonably determine that TriWest's revised Factor 4 proposal "**clearly meets** the minimum requirements of the solicitation." AR Tab 87 at 214 (emphasis added).

272. For this reason, as well, DHA's evaluation was arbitrary and capricious.

## COUNT VI

### TRIWEST FAILED TO INCLUDE A MANDATORY LETTER OF COMMITMENT FOR ALABAMA BCBS AND MUST BE DISQUALIFIED

273. HNFS realleges and incorporates each of the foregoing paragraphs as it fully set forth herein.

274. As discussed in paragraphs 108 through 112, TriWest proposed to rely on the network of Alabama BCBS in performing the T-5 contract but failed to submit a letter of commitment for Alabama BCBS in violation of the RFP's requirements.

275. "[A] proposal that fails to conform to the material terms and conditions of [a] solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1365-66 (Fed. Cir. 2021) (internal quotations and citations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 (Fed. Cir. 2009); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d at 1367-68; *Am. K-9 Detection*

*Servs., LLC v. United States*, 155 Fed. Cl. 248, 278-79 (2021); *SigNet Techs., Inc. v. United States*, 154 Fed. Cl. 396, 409-10 (2021); *Gen. Dynamics Mission Sys., Inc. v. United States*, 137 Fed. Cl. 493, 521-22 (2018); *Prescient, Inc. v. United States*, 125 Fed. Cl. 475, 491 (2016).

276.     By failing to include a mandatory letter of commitment for Alabama BCBS, TriWest's proposal failed to conform to the material terms and conditions of the solicitation.  As a result, TriWest's proposal should have been considered unacceptable.

277.     Moreover, the "[w]aiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision."  *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 653 (2008) (citing *Alfa Laval*, 175 F.3d at 1367-68; *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 138 (1999)).

278.     To the extent DHA waived the mandatory requirement to submit a letter of commitment for Alabama BCBS, this waiver benefitted only TriWest to the detriment of HNFS and, as a result, the waiver invalidates DHA's selection decision.

279.     DHA's failure to eliminate TriWest as a result of its missing letter of commitment was arbitrary and capricious.

## COUNT VII

**DHA ENGAGED IN UNEQUAL TREATMENT BY OVERLOOKING TRIWEST'S FAILURE TO INCLUDE A PROOF OF ITS PERMISSION TO USE THE NETWORK OF ANOTHER WHILE DOWNGRADING HNFS' PROPOSAL FOR FAILING TO MEET AN EVEN HIGHER STANDARD**

280.     HNFS realleges and incorporates each of the foregoing paragraphs as it fully set forth herein.

281.     As discussed in paragraphs 108 through 112, TriWest failed to submit a letter of commitment for Alabama BCBS in violation of the RFP's requirements, but DHA did not downgrade or penalize TriWest for this failure.

282.     As discussed in paragraphs 161 to 164, DHA downgraded and criticized HNFS' proposal and assigned Weakness 1, because DHA could not ███████████████████████ ████████████████████████, despite the fact that HNFS █████████████ ████████████████████████████████████████████████████.

283.     Where an "agency inconsistently applied objective solicitation requirements between [an offeror] and other offerors," this constitutes unequal treatment.  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

284.     An agency decision is arbitrary and capricious when it results from unequal treatment of the offerors.  *Thalle Constr. Co. v. United States*, 159 Fed. Cl. 698, 707 (2022) (citing *CliniComp Int'l Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014) (noting that "[u]nequal treatment is fundamentally arbitrary and capricious, and violates . . . full and open competition").

285.     DHA inconsistently applied the objective solicitation requirements regarding the standard for demonstrating the veracity of offerors' claims in their proposals regarding the ████ ████████████████████████████████████████████████████ █████████████████████████████████████████.  This constituted unequal treatment.

286.     DHA's selection decision was arbitrary and capricious because it resulted from unequal treatment.

287.     DHA's unequal treatment prejudiced HNFS because, if DHA had properly rejected or downgraded TriWest on the basis of its missing letter of commitment, HNFS would have had a substantial chance of receiving the award.  Moreover, if DHA had held HNFS to the lower standard that it applied to TriWest (not requiring a letter of commitment and not requiring

███████████████████ ), HNFS would have received a higher rating and could have

proposed ██████████████ , resulting in a higher technical rating and providing

HNFS with a substantial chance of receiving the award.

**COUNT VIII**

**DHA'S EVALUATION OF TRIWEST'S TECHNICAL MERIT AND TECHNICAL RISK
UNDER FACTOR 1 DEVIATED FROM THE RFP AND WAS ARBITRARY AND
CAPRICIOUS**

288.    HNFS realleges and incorporates each of the foregoing paragraphs as it fully set

forth herein.

289.    As discussed in paragraphs 113 through 151, DHA's evaluation of TriWest's

proposal under Factor 1 with respect to both technical merit and technical risk was inconsistent

with the Solicitation and was arbitrary and capricious.

290.    An agency's evaluation of proposals must be consistent with the standards set

forth in the solicitation.  FAR 15.305(a); *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed.

Cl. 643, 653–54 (2008) (citing *Dubinsky v. United States*, 43 Fed. Cl. 243, 267 n. 56 (1999)

(noting that FAR 15.305(a) "does not grant contracting officers carte blanche to notify offerors

of one rating system in the RFP and to then apply a different system during the evaluation of

proposals"); *Kilgore Corp.*, B-253672 *et al.*, Oct. 13, 1993, 93-2 CPD ¶ 220.  An agency's

failure to evaluate in accordance with the solicitation's terms constitutes evidence of arbitrary

and capricious decision-making. *L-3 Commc'ns EOTech*, 83 Fed. Cl. at 653-54 (citing *Dubinsky*,

43 Fed. Cl. at 267 n.56 (noting that "[s]uch action is arbitrary and capricious and provides

grounds for granting a protest if it prejudices unsuccessful offerors")).

291.    HNFS was prejudiced by DHA's improper Factor 1 evaluation because the

improper evaluation of TriWest's proposal resulted in improperly elevated Factor 1 merit and

risk ratings for TriWest and, ultimately award to TriWest.  If DHA had performed a Factor 1 evaluation that was rational and consistent with the RFP, TriWest's proposal would have received lower Factor 1 ratings and HNFS would have had a substantial chance of receiving the award.

## COUNT IX

### DHA'S ASSIGNMENT TO HNFS OF TWO TECHNICAL WEAKNESSES WAS BASED ON UNSTATED EVALUATION CRITERIA

292.     HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

293.     It is a fundamental tenet of procurement law that proposals must be evaluated reasonably and in accordance with the terms of the solicitation.  *See, e.g., Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*,  365 F.3d 1345 (Fed. Cir. 2004); *Ashbritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009); *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 786 (2009); *see also* FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.")  The Court will find that an agency acts unreasonably when it utilizes unstated evaluation criteria in evaluating proposals.  *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 443-46 (2022).

294.     As explained in paragraphs 22 through 25 above, the RFP provided clear criteria for evaluating offerors' technical proposals.  Relevant here, under Subfactor 1, Network Management, DHA was only to evaluate:

> T]he size and extent of the Offeror's proposed new network build (as described in Attachments L-9e and/or L-9w, depending on which region is proposed) and the adequacy of the evidence the Offeror provides demonstrating that it is and will be authorized to use as part of its TRICARE network any existing network

> (proposed as part of its new network build) not owned by the
> Offeror.  If the Offeror proposes to use any parent-entity networks
> or leased networks, the Government will evaluate the letter(s) of
> commitment signed by the cognizant network owner(s) to assess
> the readiness/willingness of the owner(s) to participate in or join
> the Offeror's TRICARE network.

Ex. 1, Conformed RFP, at M6 (§ M.7.2.1.3.2) (GAO AR Tab 87).

295.    Thus, as per the RFP evaluation criteria, DHA was only to assess "the adequacy of the evidence" that an offeror provided for its proposed use of an existing network that is "not owned by the offeror." *Id.*

296.    However, despite the fact that HNFS proposal established that it would ███████ █████████████████████████████████████, HNFS FPR, Vol. II (GAO AR Tab 107) at II-29, DHA assessed HNFS a weakness (Weakness 1) for ███████████████████ on the basis that "the TET was unable to validate that this approach in combination with the other network build approaches it describes for the ████████████ would result in a network sufficient in number, mix and geographic distribution to meet ATC standards."  SSDD (GAO AR Tab 141) at 4.  Because the RFP's evaluation criteria did not require DHA to validate an offeror's network when that offeror was proposing to ████████████████████, this weakness was the result of unstated evaluation criteria.

297.    The assessment of Weakness 2 was also the result of unstated evaluation criteria. Under Subfactor 2, Clinical Management, DHA was required to evaluate HNFS' "proposed approach for offering timely in-home CM services to beneficiaries that reduce the risk of readmission and for carrying out first in-home visits to beneficiaries within 48 to 72 hours post discharge from inpatient care."  Ex. 1, Conformed RFP, at M9 (§ M.7.2.2.4) (GAO AR Tab 87).

298.    HNFS provided a fully detailed approach to meeting the in-home case management service requirements and explained that its approach would be fully assisted by

HNFS' █████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████   HNFS FRP, Vol. II (GAO AR Tab 107) at II-83.

299.   However, DHA assigned HNFS a weakness (Weakness 2) based on the fact "that

HNFS is ████████████████████ and that the requirements that are likely to require

████████████████████████████████████████████████ and

"████████ of the execution . . . ."  SSDD (GAO AR Tab 141) at 18.  Despite the fact that the

RFP makes no mention that an offeror may be penalized for using "████████████" or a

"████████ of the execution" but rather was focused on the offeror's ability to meet a 48 to 72

hour deadline, DHA unreasonably assigned HNFS this weakness, once again, utilizing criteria

untethered from any evaluation criteria.

300.   These wrongly assessed weaknesses prejudiced HNFS because the SSDD

demonstrates that both Weakness 1 and Weakness 2 impacted HNFS' standing in this

competition and mitigated the otherwise strength of its strong Technical proposal.  *See id.* at 7.

301.   But for DHA assessing Weakness 1 under Technical Subfactor 1, HNFS would

have also received an Outstanding rating similar to TriWest, or, at least, a Good rating which

would have better situated HNFS in the best value tradeoff given its superiority over TriWest

under the equally weighted Technical Subfactor 3 and Technical Subfactor 5.  *See id.* at 2-3, 27-

29, 35-36.  Similarly, Weakness 2 under Technical Subfactor 2 also served to downgrade HNFS'

proposal to a rating of only "Good" despite DHA recognizing 12 distinct strengths with HNFS'

approach.  *Id.* at 2.  Both of these weaknesses also led to DHA having lower confidence in

████████████████████████████████████████████████

HNFS' approach under the two technical subfactors that weighed most heavily in DHA's award decision, which most certainly harmed HNFS in this close competition.

## COUNT X

### DHA'S TECHNICAL FACTOR DISCUSSIONS WERE MISLEADING

302.    HNFS realleges and incorporates each of the foregoing paragraphs as it fully set forth herein.

303.    When an agency conducts discussions, they must be meaningful and not misleading. *See Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 45-46 (2016).  An agency may not mislead an offeror "through the framing of a discussion question, into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies; or the government's requirements." *Id.* (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 48 (1997)) (internal quotation marks and citation omitted).

304.    DHA misled HNFS during discussions process, inducing HNFS into a false sense of security that all outstanding issues with HNFS' proposal had been resolved when in fact DHA failed to communicate that its ENs 8 and 13 remained unresolved (in DHA's mind) and would result in the two weaknesses assessed to HNFS' proposal.

305.    With regard to Weakness 1, DHA issued HNFS EN 8 that identified an issue with HNFS' ███████████████████████████ HNFS – Round 1 – Discussions – Competitive Range and Evaluation Notices from CO (GAO AR Tab 56) at 20-22.  HNFS addressed this concern in its March 18, 2022 revised proposal, *see* HNFS – Round 1– Discussions – Responses to Evaluation Notices (GAO AR Tab 60), and DHA did not again raise these concerns.  While DHA had numerous opportunities to inform HNFS of its remaining

concerns during the subsequent nine rounds of discussions, *see* HNFS – Round 9 – Discussions, Distributed ENs (GAO AR Tab 81), EN 22; HNFS – Round 10 – Discussions, Distributed ENs (GAO AR Tab 84), EN 27, DHA remained silent all the while as it identified numerous other issues for discussions.

306. Notwithstanding this silence, DHA ultimately assessed HNFS Weakness 1 "relating to the use of its ███████████████████████████████ ██████████████████████████████████." SSDD (GAO AR Tab 141) at 4.

307. Thus, DHA constructively messaged to HNFS that previously raised issues had been resolved and were not required to be addressed further, when that was not the case. In omitting from subsequent rounds of discussions the remaining concerns that DHA had regarding HNFS' approach to addressing the issues identified in EN 8, DHA misled HNFS.

308. DHA did the same with regard to Weakness 2. During the first two rounds of discussions, DHA identified a significant weakness in HNFS Technical Subfactor 2 proposal, requesting that HNFS clarify its approach to completing clinical management in-home visits within the required 48 to 72 hour post discharge timeframe. HNFS – Round 1 – Discussions – Competitive Range and Evaluation Notices from CO (GAO AR Tab 56), EN 13; HNFS – Round 2 – Discussions, Distributed ENs (GAO AR Tab 61), EN 34. In response to these two ENs, HNFS submitted its revised approach to address DHA's concerns and never again heard from DHA during the subsequent eight rounds of discussions. DHA had ample opportunities to identify any remaining issues with HNFS' Subfactor 2 approach but did not, once again, giving HNFS the false sense of security that all outstanding issues with its approach had been resolved.

309. Nevertheless, DHA assigned a weakness under Subfactor 2 for "not describ[ing] an adequate approach or understanding to meet the in-home CM visit requirements . . . [because]

██████ **REDACTED VERSION**

the ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████.”  SSDD (GAO AR Tab 141) at 17-18.

310.    In conducting such wide-ranging discussions over a course of ten rounds, DHA

clearly messaged to offerors that any and all concerns were being raised with offerors until fully

resolved.  Because the issues related to EN 13 and EN 34 were not fully resolved and resulted in

a weakness, DHA should have raised this issue anew in the subsequent eight rounds of

discussions and DHA's failure to do so constituted misleading discussions.

311.    As explained above, these misleading discussions prejudiced HNFS because the

flawed discussions resulted in the assignment of two technical weaknesses which downgraded

HNFS' otherwise strong technical proposal and led to DHA selecting TriWest's more expensive

proposal on the basis of its illusory technical advantages.

## COUNT XI

### DHA FAILED TO REASONABLY EVALUATE TRIWEST'S PC3 CONTRACT REFERENCE FOR RELEVANCY IN THE MANNER DICTATED BY THE RFP'S PAST PERFORMANCE (FACTOR 2) EVALUATION CRITERIA

312.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set

forth herein.

313.    As noted above, it is a fundamental tenet of procurement law that proposals must

be evaluated reasonably and in accordance with the terms of the solicitation.  *See, e.g., Banknote*

*Corp. of Am.*, 56 Fed. Cl. at 386; *Ashbritt, Inc.*, 87 Fed. Cl. at 374; *Red River Holdings, LLC*, 87

Fed. Cl. at 786; *see also* FAR 15.305(a) ("An agency shall evaluate competitive proposals and

then assess their relative qualities solely on the factors and subfactors specified in the

solicitation.")

314.    The Court will find an agency to have acted contrary to law where the record reflects that submitted past performance was evaluated in a fundamentally unreasonable manner that is contrary to the RFP's Past Performance evaluation criteria.  *See, e.g.*, *Frawner Corp.*, 161 Fed. Cl. at 443-46 (holding agency committed error where its evaluation of past performance was contrary to solicitation criteria); *AM General, LLC v. United States*, 115 Fed. Cl. 653, 672-74 (2014) (same).

315.    As outlined in paragraphs 174 through 176 above, the RFP's Factor 2 Past Performance relevancy criteria for "complexity" mandated that offerors' submitted experience be compared against a list of fourteen preestablished requirements criteria.  Ex. 1, Conformed RFP, at M20 to M21 (GAO AR Tab 87).  Furthermore, the RFP specified that a reference could only receive a "Very Relevant" rating if it demonstrated "essentially the same scope and magnitude of effort ***and complexities*** this [T-5] solicitation requires."  *Id.* at M20 (definition of "Very Relevant," emphasis added).

316.    TriWest's critical PC3 reference is the reference which was the predominant focus of the SSA's evaluative analysis for Factor 2 and the only reference for which TriWest received a "Very Relevant" rating.  *See* SSDD (GAO AR Tab 141) at 52-56.  However, the record reflects that TriWest's PC3 contract was affirmatively found by the PPET to lack "complexity" similarity with four of the 14 complexity requirements: "[1] enrollment, [2] predictive modeling for population health, [3] Telehealth services, and [4] claims processing." TriWest PPET Report with Individual Contract Reviews (GAO AR Tab 120) at 16.

317.    Furthermore, the record reflects that the PPET effectively failed to evaluate two additional complexity criteria: "management of referrals to specialty care" and "utilization management."  *Id.*

318.    Finally, the evaluation record reflects that the PPET fundamentally overlooked obvious and fundamental differences in the degree of complexity of the PC3 contract with respect to "establish and maintain provider networks" and "network provider directory."  *Id.*

319.    Despite the acknowledgment that PC3 lacked similar complexity in 4 of 14 complexity areas mandated for assessment by the RFP, and a lack of evidentiary support for 4 additional categories, the SSA unreasonably accepted the PPET's conclusion that PC3 reflected "essentially the same . . . complexities" that the T-5 solicitation requires.  SSDD (GAO AR Tab 141) at 52-54.  The PC3 contract reference then became the most significant element of the SSA's conclusion that TriWest's past performance record was superior to that of HNFS, thereby justifying granting TriWest an advantage under Factor 2 in the tradeoff analysis.  *Id.* at 55.

320.    For these reasons, as explained throughout this Complaint, DHA conduct was arbitrary, capricious, and contrary to law.  Thus, this protest must be sustained.

## COUNT XII

### DHA ARBITRARILY AND CAPRICIOUSLY EVALUATED HNFS' INCUMBENT T-2017 MCS CONTRACT PAST PERFORMANCE UNDER FACTOR 2

321.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

322.    HNFS' T-2017 performance Quality was deemed to be only "Satisfactory" despite 4 years of better-than-satisfactory performance results based on early challenges during HNFS' first two performance periods.  *See* HNFS OP2 – OP4 CPARs (GAO AR Tab 125) at 28, 37, 45; *see also* HNFS GAO Protest, Ex. 35, HNFS T-2017 OP5 CPAR at 2.

323.    While HNFS accepts it bears partial responsibility for those performance challenges, it is a matter of public, factual record that HNFS' performance was greatly hampered by DHA's mismanagement of the T-2017 transition process.  This is the published, formal

findings of a GAO investigation.  *See* GAO Publication No. 20-39, *Defense Health Care: Opportunities to Improve Future TRICARE Managed Care Support Contract Transitions*, *supra*.

324.     This GAO report is not only public information about the incumbent contract to T-5, but GAO confirms that it "interviewed officials from DHA, including the deputy director, transition managers, and contracting officers for each TRICARE region." *Id.* at 007.  Thus, numerous personnel at DHA, including those involved with the T-5 procurement process, were personally aware of this GAO report's existence, and the findings contained within.

325.     Yet, the Factor 2 evaluation in the PPET and in the SSDD reflects absolutely no acknowledgment of DHA's significant contributory role to the early performance of T-2017. Instead, all blame is foisted onto HNFS via CPARS authored by the very people who were responsible for mismanaging the contract.

326.     The failure to consider the publicly available, personally known "close at hand" information about the incumbent contract being managed by the same DHA Aurora contracting office that is conducting the T-5 procurement was unlawful and arbitrary.  This failure skewed the assessment of HNFS' most significant contract that was primarily responsible for driving its Factor 2 evaluation.  *See Seattle Sec. Services, Inc. v. United States,* 45 Fed. Cl. 560, 566 (2000).

327.     But for DHA's failure to consider the critical contextual information outlined in the GAO report, HNFS would have been granted the "Very Good" rating that was suggested by the T-2017 contracting staff in the PPQ, which would have materially improved HNFS' comparative standing vis-à-vis TriWest under Factor 2.

328.     For these reasons, as explained throughout this Complaint, DHA's conduct was arbitrary, capricious, and contrary to law.  Thus, this protest must be sustained.

## COUNT XIII

### DHA DISPARATELY EVALUATED THE T-2017 AND PC3 CONTRACT PERFORMANCE QUALITY UNDER FACTOR 2

329.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

330.    It is hornbook law that, "in evaluating offerors' past performance in a best value consideration, 'the contracting agency must treat all offerors equally,' meaning that 'it must evaluate offers evenhandedly against common requirements and evaluation criteria.'"  *McVey Co., Inc. v. United States*, 111 Fed. Cl. 387, 403 (2013) (quoting *Seattle Sec. Servs., Inc.*, 45 Fed. Cl. at 569); *see also* FAR 1.602–2 (requiring a contracting officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment").

331.    The Federal Circuit has further recognized that actionable disparate treatment arises where "that the agency unreasonably downgraded [the plaintiff's] proposal for deficiencies that were substantively indistinguishable or nearly identical from those contained in other proposal." *Off. Design Grp.*, 951 F.3d at 1372.

332.    Both HNFS and TriWest experienced performance problems in the early stages of contract performance of T-2017 and PC3, respectively.  In spite of its 3 years' worth of Marginal ratings, TriWest was given a Very Good rating for its overall PC3 performance based on three factors outlined above: (1) TriWest's "continuous improvement in contract performance throughout the life of the contract and for the past three years has continuously sustained 'Very Good' to 'Exceptional' performance"; (2) the fact that "there were many significant, and often unanticipated, Government driven changes to the program requirements, some legislative, which changed the scope of requirements on short notice during performance"; and (3) "the comments

from multiple VA personnel, over time, in the record, that continuously highlight the work, cooperation and dedication of TW."  SSDD (GAO AR Tab 141) at 53-54.

333.    HNFS' T-2017 performance met every one of these criteria—and more.

334.    HNFS' past three years of performance have included 7 Exceptional ratings, 5 Very Good ratings, and 3 Satisfactory ratings, with nothing below Satisfactory.  *See* HNFS OP2 – OP4 CPARs (GAO AR Tab 125) at 28, 37, 45; *see also* HNFS GAO Protest, Ex. 35, HNFS T-2017 OP5 CPAR at 2.   This reflects "continuous improvement" and demonstrates "continuously sustained 'Very Good' to 'Exceptional' performance" over "the past three years."

335.    As set forth in paragraphs 198 through 199 above, HNFS not only endured "many significant, and often unanticipated, Government driven changes to the program requirements . . . which changed the scope of requirements on short notice during performance" via the implementation of TRICARE Select, but HNFS also was required to deal with the extra challenge of DHA's mismanagement of the T-2017 transition, as reflected in GAO Publication No. 20-39.  *See* GAO Publication No. 20-39, *Defense Health Care: Opportunities to Improve Future TRICARE Managed Care Support Contract Transitions*, *supra*.

336.    Finally, HNFS' overcoming of multi-causal early performance challenges, reflected in the aforementioned dramatic CPARS ratings improvements, and strong PPQ, was bolstered by a litany of positive evaluative "comments from multiple VA personnel, over time, in the record, that continuously highlight the work, cooperation and dedication" of HNFS to make T-2017 West Region the highly successful contract program it is today.  Examples of these comments are set forth in paragraph 200 above.  *See also* HNFS OP2 – OP4 CPARs (GAO AR Tab 125) at 24-38.

337.    Yet these same considerations that led to the SSA giving TriWest a "Very Good" rating for its PC3 performance despite three years of performance problems did not lead to any meaningful credit for HNFS.

338.    HNFS' dramatic CPARS ratings improvements were briefly mentioned by the SSA, but given no meaningful weight, as the SSA declared that "the managed care support services provided to TRICARE beneficiaries, and the military readiness support requirements, in OP1 are just as important as those services more recently provided during later Ops."  SSDD (GAO AR Tab 141) at 48.  In other words, improvement was irrelevant for HNFS.  But it was hugely relevant for TriWest.

339.    Next, HNFS' struggle to overcome massive requirements changes was noted in passing only once, and HNFS' struggle to overcome DHA mismanagement as outlined in the GAO report was completely ignored.  There is absolutely no explanation in the record for why TriWest warranted significant credit for overcoming its contract requirements changes, while HNFS deserved minimal credit for overcoming equivalent changes *plus* DHA contract mismanagement.

340.    Finally, none of the positive comments in HNFS' CPARS from the past four years were mentioned in the SSA's Factor 2 assessment, much less cited as critical mitigating factors to overcome early performance problems as they were for TriWest.  Only TriWest had its favorable comments highlighted.

341.    The disparate treatment in the assessment of T-2017 and PC3 performance Quality led TriWest to garner a critical comparative advantage in the assessment of each offeror's most significant and relevant contract work.  The "Very Good" PC3 reference became a

key consideration in why TriWest was found to have a superior overall Factor 2 proposal.  *See id.* at 55.

342.    For these reasons, as explained throughout this Complaint, DHA's conduct was arbitrary, capricious, and contrary to law.  Thus, this protest must be sustained.

## COUNT XIV

## DHA'S BEST-VALUE DECISION WAS ARBITRARY AND CAPRICIOUS AND BASED ON DHA'S PREJUDICIAL ERRORS

343.    HNFS realleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

344.    The cumulative effect of the errors described above irreparably taints DHA's best-value decision because "a tradeoff analysis based on significantly flawed evaluation ratings is itself irrational."  *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 693-94 (2012); *see Huntsville Times Co. v. United States*, 98 Fed. Cl. 672, 696 (2010) ("[T]hese significant errors are enough to significantly compromise the award decision").

345.    But for DHA's failure to disqualify TriWest based on its repeated material misrepresentations and omission of mandatory materials in its Factor 4, Small Business Participation and Factor 2, Past Performance proposals, TriWest would have been eliminated from this competition.  As discussed above, TriWest failed to meet the Solicitation's small business participation requirements due to its undue reliance on other-than-small businesses and failure to meet multiple of the Factor 4 requirements.  TriWest further introduced fundamental inconsistencies across its proposal when it belatedly attempted to claim changes to its small business participation, relied on an admittedly erroneous historical small business subcontracting calculation methodology, and omitted a mandatory letter of commitment from its proposed network subcontractor, BCBS of Alabama.  Any one of these errors required DHA to disqualify

REDACTED VERSION

TriWest from this procurement.  Because HNFS was the only other offeror, HNFS would have been awarded the T-5 contract.

346.    Additionally, DHA's award to TriWest was the result of numerous errors in the evaluation of the offerors' Technical and Past Performance and DHA's flawed conduct of discussions, which significantly prejudiced HNFS.  DHA's Technical, Technical Risk, and Past Performance evaluations blindly credited TriWest with "demonstrated experience" and "very relevant" past performance where TriWest had none.  Indeed, DHA erroneously concluded that "approximately ███ of [TriWest's required T-5 network] is already established through existing Federal VA CCN and PCCC contracts," TriWest – Subfactor 1 – Final Technical Evaluation_M.7.2.1 (GAO AR Tab 126) at 13, when in fact TriWest's proposal was deliberately unclear regarding the precise contents of its "Federal" network, and even the subcontractor networks currently in place under TriWest's CCN contract do not demonstrate any experience with achieving the unique network discounts or heightened accreditations required for the T-5 contract.

347.    Moreover, each of DHA's Factor evaluations was rife with unequal treatment, as DHA blindly accepted TriWest's unsubstantiated proposal assertions while simultaneously scrutinizing HNFS' proposal for (less substantial) new network build, thoroughness of proposed technical approach, performance improvement trends, and ability to achieve guaranteed provider discounts.  Given that DHA's best value decision—selecting TriWest's proposal for award despite HNFS' **$465 million** price advantage—was based on DHA's materially flawed underlying evaluations, DHA's best value decision was flawed in its entirety.

## VI.    BASIS FOR INJUNCTIVE RELIEF

348.    HNFS realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

349.    Given the fundamental flaws in DHA's procurement process and the irrationality of the award decision, permanent injunctive relief enjoining DHA from allowing TriWest to perform the contract is appropriate.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed. Cir. 2004); *AGMA Security Servs. v. United States*, 152 Fed. Cl. 706, 739-42 (2022).

350.    Absent an injunction, HNFS will be irreparably harmed because it will forever lose the ability to fairly compete for this $65 billion contract based on a fair and equal evaluation of proposals that was rational and consistent with the Solicitation's evaluation terms and law and regulation.

351.    DHA will not be harmed by such an injunction.  Any potential harms DHA may allege were brought about by its own arbitrary, capricious, and unlawful actions and are overcome by its own long-term interest in ensuring that the awarded contract represents the best overall value to the Government.  Similarly, TriWest will not be harmed by the imposition of an injunction because it has no right to perform an invalid and irrationally awarded contract.

352.    Finally, the public interest favors the granting of injunctive relief.  Government procurements should be administered in a fair and rational process, resulting in award decisions consistent with solicitation requirements and procurement law and regulations.  *See, e.g.*, *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 94 Fed. Cl. 389, 393 (2010). DHA's award to TriWest was none of these things, rendering it arbitrary and capricious.

REDACTED VERSION

353.    There is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes, regulations, and the terms of their own solicitations.

## VII.   PRAYER FOR RELIEF

For each and all of the foregoing reasons, HNFS requests that the Court enter judgment in its favor and provide the following relief:

1. Declare DHA's award to TriWest to be arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with law and regulation;

2. Enjoin DHA to terminate the award to TriWest, disqualify TriWest from the competition, and award the contract to HNFS as the only remaining awardable offeror; and

3. Grant any other such relief as the Court may deem just and appropriate.


August 8, 2023                          Respectfully submitted,

                                        /s/ Amy L. O'Sullivan
                                        Amy L. O'Sullivan
                                            (Counsel of Record)

                                        Robert J. Sneckenberg
                                        Cherie J. Owen
                                        James G. Peyster
                                        William B. O'Reilly
                                        Zachary H. Schroeder
                                        Issac D. Schabes
                                        David H. Favre III
                                            (Of Counsel)

                                        CROWELL & MORING LLP
                                        1001 Pennsylvania Avenue, NW
                                        Washington, DC 20004-2595
                                        Tel: (202) 624-2563
                                        Fax: (202) 628-5116
                                        aosullivan@crowell.com

                                        *Counsel for Health Net Federal Services, LLC*